CHARLES McMICKEN PERIN, CLYDE PERIN, AND MARY E. PERIN, INFANTS, BY THEIR FATHER AND NEXT FRIEND, FRANKLIN PERIN, COMPLAINANTS AND APPELLANTS, *v.* FREEMAN G. CAREY, WILLIAM CROSSMAN, AND WILLIAM M. F. HEWSON, EXECUTORS OF THE LAST WILL AND TESTAMENT OF CHARLES McMICKEN, DECEASED, THE CITY OF CINCINNATI, ELIZABETH RANDALL, DAVID P. STELLE, AND ELIZABETH STELLE, HIS WIFE, AND ANDREW McMICKEN, RESPONDENTS.

Charles McMicken, a citizen and resident of Cincinnati, in Ohio, made his will in 1855, and died in March, 1858, without issue.

He devised certain real and personal property to the city of Cincinnati and its successors, in trust forever for the purpose of building, establishing, and maintaining as far as practicable, two colleges for the education of boy and girls. None of the property devised, or which the city may purchase for the benefit of the colleges, should at any time be sold. In all applications for admission to the colleges, a preference was to be given to any and all of the testator's relations and descendants, to all and any of his legatees and their descendants, and to Mrs. McMicken and her descendants.

If there should be a surplus, it was to be applied to making additional buildings, and to the support of poor white male and female orphans, neither of whose

parents were living; preference to be given to our relations and collateral descendants.

The establishment of the regulations necessary to carry out the objects of the endowment was left to the wisdom and discretion of the corporate authorities of the city of Cincinnati, who shall have power to appoint directors to said institution.

This will can stand; and with reference to the various points of law connected therewith, this court establishes the following propositions, viz:

1. The doctrines founded upon the statute of 43 Elizabeth, c. 4, in relation to charitable trusts to corporations, either municipal or private, have been adopted by the courts of equity in Ohio; but not by express legislation, nor was that necessary to give courts of equity in Ohio that jurisdiction.

2. The English statutes of mortmain were never in force in the English colonies, and if they were ever considered to be so in the State of Ohio, it must have been from that resolution by the Governor and judges in her territorial condition; and if so, they were repealed by the act of 1806.

3. The city of Cincinnati, as a corporation, is capable of taking in trust devises and bequests for charitable uses, and can take and administer the devises and bequests in the will of C. McMicken.

4. Those devises and bequests are charities in a legal sense, and are valid in equity, and may be enforced in equity by its jurisdiction in such matters without the intervention of legislation by the State of Ohio.

5. McMicken's direction, in section 32 of his will, that the real estate devised should not be alienated, makes no perpetuity in the sense forbidden by the law, but only a perpetuity allowed by law and equity in the cases of charitable trusts.

6. There is no uncertainty in the devises and bequests as to the beneficiaries of his intention; and his preference of particular persons as to who should be pupils in the colleges which he meant to found was a lawful exercise of his rightful power to make the devises and bequests.

7. The disposition which he makes of any surplus after the complete organization of the colleges is a good charitable use for poor white male and female orphans.

8. Legislation of Ohio upon the subject of corporations, by the act of April 9, 1852, does not stand in the way of carrying into effect the devises and bequests of the will.

THIS was an appeal from the Circuit Court of the United States, sitting in equity, for the southern district of Ohio.

The bill was filed by the appellants to set aside the devises and bequests in the will of Charles McMicken to the city of Cincinnati, in trust for the foundation and maintenance of two colleges.

The nature of the devise is stated summarily in the head

note of this report, and more particularly in the opinion of the court.

The bill specified the following objections to the validity of the devises and bequests:

1. "Said city of Cincinnati was formerly a municipal corporation, created and having certain powers conferred upon it by an act of incorporation of the Legislature of the State of Ohio, but it now exists only as a political division of the State, under a general law having a uniform operation throughout the State, and is without any power or authority to accept said devises and bequests, to acquire or hold the title to the property mentioned in said devises and bequests for the purposes therein expressed, or to execute the trusts or any of them therein set forth and declared.

2. "Said Charles McMicken, deceased, has undertaken, by said alleged devises and bequests, to render a large amount of real estate above described, situate in said city of Cincinnati, in said State of Ohio, and an indefinite amount of real estate to be hereafter purchased in said city of Cincinnati, forever unalienable, contrary to the law and public policy of said State.

3. "There are no persons mentioned or referred to as beneficiaries, under the trusts attempted to be created by said will, who are so described that they are entitled to and can claim the benefit of said trusts or any of them, and the same are therefore void for uncertainty.

4. "By the terms of said will, the establishment of the regulations necessary to carry out the objects of the endowment attempted to be made, and the power to appoint directors of the institutions therein named, are vested in the corporate authorities of the city of Cincinnati, but there are no persons, either artificial or natural, who fall within or are sufficiently identified by said description.

5. "The trusts attempted to be created by said will are uncertain and illegal for the further reason, that the distribution of the trust fund between the two objects, of the education of white boys and girls and the support of poor white male and female orphans. is to be left to the unrestrained discretion of

the city of Cincinnati, or of the corporate authorities of the city of Cincinnati.

6. "The trust attempted to be created by said will for the support of poor white male and female orphans is illegal and void, because, without authority of law, and in violation of the statutes and public policy of the State of Ohio, it is therein required that before they shall receive any benefit therefrom, their guardians, or those in whose custody they are, shall have first entirely relinquished their control of them to the said city; and provided, that those orphans who may have remained until they have reached any age between fourteen and eighteen years shall be bound out by the said city to some proper art, trade, occupation, or employment."

The respondents demurred to the bill, which was sustained by the Circuit Court and the bill dismissed. The complainants appealed to this court.

It was argued by *Mr. Headington* and *Mr. Ewing* for the appellants, and by *Mr. Pugh* and *Mr. Taft* for the appellees.

A separate argument was filed by *Mr. Headington*, of one hundred pages; a joint one by *Mr. Ewing* and himself, of twenty pages; an argument by *Mr. Pugh*, of thirty pages; and one by *M. Taft* and *Mr. Perry*, of eighty-seven pages.

The reporter is embarrassed by the quantity of matter, all of which he would lay before his readers if it were possible. But being obliged to select only a part, he prefers to omit the arguments relating to the English system of trusts and charities, with which the profession are doubtless acquainted, and, after some general points, to confine his attention to those arguments which relate especially to the state of the law in Ohio.

*Mr. Headington* and *Mr. Ewing* laid down these general propositions:

In behalf of the appellants, we claim that the devise and bequest to the city in trust should be held void, on the

grounds that the trustee, the city of Cincinnati, is incapable of taking and executing the trust, and that the *cestuis que trust* are dependent on the selection and designation of the trustee; consequently, that there is not, nor can there ever be, either trustee or *cestui que trust*.

And that in violation of the Constitution of Ohio, it withdraws the colleges from the power of the Legislature, and makes them immortal, and it creates a perpetuity in the lands with which they are endowed, making them inalienable forever, which is against the letter and the policy of the law.

The course of argument led to the examination of this devise, irrespective of the law of charities, under the ordinary rules of equity; and afterwards as a charity. Upon both of these grounds the devise was claimed to be void, and both points were investigated at great length.

The counsel then spoke of the course of decisions in England, commented on by this court, and proceeded as follows:

3. This system is not ours; it is not the law of this court, nor is it the law of Ohio.

In 1795, the Northwestern territory adopted from the Virginia code a law adopting British statutes prior to the fourth year of James I. The Ohio Legislature enacted it in 1805, and repealed it in 1806; so we have none of it. We have in Ohio laws respecting religion, education, and charities, but they are to be construed, as we submit, precisely as if there had never been a statute of Elizabeth in England.

But it is said there has been a course of legislation in Ohio tending to the same result with the statute of Elizabeth, and that *pro tanto*, at least, the decisions under that statute ought to be regarded. An analysis of those laws will, I think, set this question of legislative sanction at rest. Each act which that Legislature has ever passed on the subject performs its own special office distinctly and exactly, and leaves everything else under the implied negative, that the Legislature did not choose to include it. They are six in number, providing:

1. That a devise to the poor of a township shall vest the estate in the trustees of the township, for the use of the poor Swan, 612, sec. 14.

2. A devise to the State of Ohio, or to any person whom-soever, in trust for the common-school fund, the same shall be vested in the common-school fund.

Swan, 832, sec. 5; 839, sec. 11.

3. The respective township boards of education shall have power to take and hold in trust for the use and benefit of any "central or high shool, or sub-district school in the township."

Swan, 852.

4. The trustees of the lunatic asylum may take and hold in trust any lands, &c., conveyed, &c., to be applied to any purpose connected with the institution.

Swan, 556 and 127.

5. Townships which have been lawfully laid off and designated shall have power to receive any devise, &c., to the township, for the benefit of the township, either for a public square or other useful purpose specified in such devise, &c., and shall hold the same in trust for the township, for the purposes specified in such conveyance.

Swan, 992, sec. 1.

6. The trustees of any university, college, or academy, (created according to the provisions of the act in which the authority is found,) may hold in trust any property devised, bequeathed, or donated, upon any specific trust, consistent with the objects of such corporation.

Swan, 192, sec. 3.

Now, all these provisions are very distinct and exact, and require no loose or irregular construction. On the contrary, they seem intended to prevent it, by laying down plain rules for conveyances to all such uses as the Ohio Legislature thought proper to regard with favor; and if any of the requisites of an ordinary conveyance in trust is dispensed with, it is written down in plain terms.

There was a clause in a statute of 1838 (36 Ohio Laws, p. 35, sec. 43) which admitted of a very large construction. It directed the superintendent of common schools "to take an account of all funds and property given in any way for the support of education, except chartered colleges, and to carry into effect, *as nearly as may be,* the object of the trust."

In the revision under the Constitution of 1851 this was repealed, and in its stead the attorney general is directed "to cause proper suits to be instituted at law and in chancery to enforce the performance of trusts for charitable and educational purposes, and restrain the abuse thereof." All that is loose and latitudinarian in the act of 1838 is excluded from the act of 1852, namely: "funds and property given *in any way*," and directions to carry "into effect, *as nearly as may be,* the object of the trust." "*As nearly as may be*" *cy. pres* adopted and repealed, not *repealed by accident,* but because the legal world condemned it. The attorney general, in its stead, is directed to enforce the performance of *trusts*—valid trusts, of course, such as the laws authorize.

The statute of March 26, 1856, is relied on by defendants' counsel. It provides:

"That whenever any person shall by deed, devise, gift, or otherwise, set apart any lands, moneys, or effects, as an endowment of a school or academy, not previously established, and shall not provide for the management of such school or academy, the court of common pleas of the proper county shall appoint five trustees, who shall have the control and management of the property, moneys, and effects so set apart, and of the school or academy thus endowed, and shall hold their offices for five years," &c.

It cannot be supposed that this act under any ordinary construction can reach the case; but enlarged and extended under the statute of Elizabeth, it might answer any purpose to which chancellors should please to apply it. According to the ordinary rules of construction, it has the reverse effect. The Legislature had the subject of donations for educational purposes before them. They provided for schools and academies, but did not choose to provide in like manner for colleges. Colleges were already provided for just as the Legislature thought most proper.

Swan, 193, 196.

And the testator did not think fit to give his land or money to a school or academy under the control of trustees selected by the court of common pleas.

*Perin et al. v. Carey et al.*

While denying the application of the statute of Elizabeth in Ohio, we are safe in saying, that this devise could not be sustained in the English chancery by the present settled construction of the law under that act. They would hold this to be a specific charity, carefully and accurately defined, which could not go into effect according to the expressed intent of the donor. And as there is no expression of a general charitable intent, *dehors* the defined object, equity could not apply it *cy pres* to any other like charity.

Att'y Gen. *v.* Whitechurch, 3 Vez., 145.

Corbyn *v.* French, 4 Vez., 431.

Clarke *v.* Taylor, 21 Eng. Law and Eq. Rep., 308—9.

It is a devise, too, on the express condition that the provisions of the will "shall be faithfully complied with;" and the English chancery would give the testator the benefit of that condition.

De Themmines *v.* De Bonneville, 5 Russel, 288.

Now, in this case the testator declares that he gives his estate to no such trustees as the law offers him, to no such purpose as the law points out, and he submits it to no such regulations as the law makes for him. He prescribes his own conditions; the law does not admit, and cannot be modified so as to admit them. The condition of the devise cannot be complied with; the devise therefore would fail under the law of charities as now administered in England.

But we are, in Ohio, as we have shown, quite clear of the statute of Elizabeth, and of the King's prerogative, by which that statute was perverted, and we have in its stead specific legal provisions, defining the mode of donation and endowment of the various charities which it was thought fit to encourage. He who desires to found or endow an institution of learning or a charity has no need of other aid than the regular administration of the laws gives him, unless, as in this case, he desires to do what the law will not permit.

There are some familiar cases where corporations or associations made trustees were incompetent to execute the trust; in which the Legislatures, as *parentes patriæ,* have passed enabling acts granting the power, as in case of the Sailers' Snug

Harbor in New York, the Girard College in Pennsylvania, and the McIntyre Poor School in Ohio.

But the Constitution of Ohio of 1851 does not admit in future of such enabling statutes. The Legislature of that State cannot now confer on a corporation any special powers.

Art. 13, sec. 1, Swan, 27.

The statute of April 9, 1852, in strict conformity with the Constitution, provides that colleges may be founded by individuals, and incorporated under its provisions. A city cannot found a college. One man, however rich, may not found a college and be the autocrat and controller of education and mind forever; but five or three, all citizens resident, may found and incorporate a college, (Swan, 193, 195, 196,) but they cannot give it perpetuity. The directors may sell and dispose of the real estate with which it is endowed; it may be sold on execution to pay the debts of the college, and the Legislature may repeal the law under which it is incorporated, and thus alter or destroy the institution at pleasure.

Const., art. 13, sec. 2.

The 6th article of the Constitution of 1851 provides for common schools; the 1st section of the 7th article for institutions for the benefit of the insane, blind, deaf and dumb; while colleges are left to be worked out under the 13th article, with other corporations. They are placed on the same footing with railroads, mining and manufacturing companies, and the Legislature cannot, if they would, divest themselves of the power to destroy at pleasure the organization of any one of them when created according to legal warrant.

Const., art. 13, sec. 2, Swan, 27.

Act of April 19, 1852, Swan, 193—196.

This devise, then, cannot be made to conform to any law, common or statute, in Ohio, without disregarding the intent of the testator. It would require the extreme application of the *cy pres* doctrine to apply it in any known legal form. The city authorities, which the will requires should found the colleges, cannot found them; required to select the beneficiaries, they cannot select them; they cannot manage the funds nor govern the colleges; nor can the institutions come into being

stamped with the immortality and immunity from change which the testator makes a condition of their creation; nor can the lands with which they are endowed be withdrawn from the operation of law forever, without violating a long-established and well-settled principle of our jurisprudence. The testator did not create, or intend to create, a trust, such as the laws of the State can suffer to be executed. He creates the trust if it may be clothed with these impossible attributes; not otherwise. In every case of charity cited from Ohio, and we believe in every case sustained there, there was a good trustee. In no case has a corporation, without special power, been held capable of executing a trust.

There is no judicial decision in Ohio, even prior to the Constitution of 1851, which would sustain this trust. The first case that was supposed to involve the English doctrine of charities was that of the McIntyre Poor School, 9 Ohio Rep., 262. This was a devise to Amelia McIntyre and her issue; and if she should die without issue, remained to the Zanesville Canal and Manufacturing Company, in trust for the maintenance of a poor school for the town of Zanesville. The testator died; the Legislature afterwards passed a special act enabling the company to execute the trust. Amelia McIntyre died without issue, after the enabling act. The court held that the corporation thus empowered took the estate as a contingent remainder, and this is all that was decided in that case.

Chief Justice Lane, in the written opinion of the court, says: If there had been no competent trustee, the estate would descend to the heir charged with the trust. This was obiter, as the court held the trustee competent, and the estate did not descend. But the dictum was right if the trust was not discretionary, and wrong if it was. It does not seem to have been discretionary; there was no selection of beneficiaries— not on the tax list. Judge Lane cited in its support a dictum of Mr. Justice Thompson in Inglis v. the Sailors' Snug Harbor, 3 Pet., 119, which rests on a special provision of the will, attaching the trust to the legal estate, wherever it might pass. Mr. Justice Thompson cites Malim v. Keighley, 2 Vez. Jr.

335, a case of ordinary trust for designated *cestuis que* trust, conferring no discretionary power on the trustee.

The case of Urmey's Executors *v.* Wooden, 1 O. S. R., 160, is also relied on. In that there was a competent trustee, and a *cestui que* trust recognised by statute.

In the same volume, p. 478, is the case of Williams *v.* the First Presbyterian Church of Cincinnati, in which a conveyance in trust for the use of an unincorporated church, created in 1797, while the statute of Elizabeth was in force in the Territory, and vested in competent trustees, who, after the church was incorporated, executed the trust, was holden valid.

These, we believe, are all the cases decided in Ohio which touch the question even remotely; and in no one of the cases in which the trust was sustained do the two fatal elements meet—an incompetent trustee and a *cestui que* trust dependent on his selection. There are, however, loose dicta by judges in some of these cases, such as are noticed by this court in Fontaine *v.* Ravenal, but no decided case in Ohio; and I believe none of these dicta sustain this devise. Since the adoption of the Constitution of 1851, and the act of 1852, above referred to, no case has been considered in the courts of that State involving the question. We have, then, in Ohio, no current of decisions; no local usage creating a special law in case of charities variant from the law in other cases; and we have nothing to do with the decisions in other States, founded partly on statutes, partly on usage, and partly on mistaken notions of the powers of a court of chancery.

17 How., 484.

If the court apply the English decisions, under the statute of Elizabeth, to Ohio, the first difficulty is to determine what shall be favored as charities. The enumeration in that statute, to which it can hardly be contended we are bound, fails us in some of its most material elements. For example, we have no established church in Ohio. The Christian religion itself forms no part of the law of that State.

Bloom *v.* Richards, 2 O. S. R., 387.

We, therefore, cannot legally distinguish pious uses from superstitious uses. All forms of religion, all the wild vagaries

of the human mind, which relate to the being or non-being of God, and the origin, the spiritual condition, and final destiny of man, if embodied and taught, must be regarded alike by our laws; and if donations forever to our leading religious sects, their colleges, or universities, be favored beyond the ordinary rules of law, so must the most absurd and most objectionable, if they be not absolutely immoral. Under these conditions, it would not greatly subserve the public good to set up special laws for the protection and perpetuation of religious or collegiate educational charities. The decisive objection to it, however, is, that our law contemplates no such thing, but has, in effect, forbidden it, and provided for the incorporation of religious societies and colleges by a statute always subject to repeal; and it has provided for their endowment in property, real and personal, and made it all subject to alienation. Then, if the course of decisions, under the statute of Elizabeth, be adopted, we must resort to our own laws to find the cases to which the special rules apply.

The English cases rest upon the enumeration in that statute. The chancellor, in Attorney General *v.* Lord Lansdale, says: "The institution of a school for gentlemen's sons is not, in popular language, a charity; but in view of the statute of Elizabeth, all schools for learning are to be so considered." We speak the popular language, and colleges are not written down in any of our statutes as charities. Swan, 51.

The 15th section of the act of May 1, 1852, making it the duty of the attorney general to cause proper suits to be instituted to compel the performance of trusts for charitable and educational purposes, will be relied on by counsel for appellees. This does not create trusts, or mend those that are imperfect, but applies only where trusts exist, created according to law. We have contemporary statutes, showing how trusts for those purposes may be created; this act directs how they may be enforced. The remarks of Ch. Just. Marshall, in Baptist Association *v.* Hart's Executors, 4 Wh., 48, 49, are most apposite to this point. He says: "It is not to be admitted that legacies not valid in themselves can be made so by force of the prerogative, in violation of private right. This superin-

tending power of the Crown, therefore, over charities, must be confined to those which are valid in law." And so with the power and duty of the attorney general, under the Ohio statute. He has nothing to do with this, unless it be a valid devise in law, and the trustee neglects or prevents it.

*Mr. Pugh's* points were the following:

I. The doctrines founded upon the statute of 43d Elizabeth, chapter 4, have been adopted by the courts of Ohio, and are recognised in that State by express legislation.

    Brown *v.* Manning, 6 Ohio Rep., 303.

    Bryant *v.* McCandless, 7 Ohio Rep., (part 2d,) 136.

    Mason *v.* Muncaster, 9 Wheat., 445.

    Williams *v.* First Presbyterian Society, 1 Ohio State
       Rep., 478, 501.

    McIntyre Poor School *v.* Zanesville Canal Co., 9 Ohio
       Rep., 203, 287.

    Zanesville Canal Co. *v.* City of Zanesville, 20 Ohio Rep.,
       488.

    Urmey *v.* Wooden, 1 Ohio State Rep., 164.

    Attorney General's Act, May 1, 1852, sec. 14, Swan's
       Stat., 51, 52.

    Derby *v.* Derby, 4 Rhode Island Rep., 439.

II. The devises and bequests are to the city of Cincinnati, for its own use, as a corporation, and are valid, therefore, without regard to the statute of 43d Elizabeth.

1. There is no statute of mortmain in Ohio, nor any exception against bodies corporate in the act relating to last wills and testaments.

    Helfenstine *v.* Garrard, 7 Ohio Rep., (part 1st,) 275.

    Hall *v.* Ashby, 9 Ohio Rep., 96, 98.

    Crawford *v.* Chapman, 17 Ohio Rep., 449, 452, 453.

2. The city is a corporation authorized by law to take and hold property, real and personal, by deed or will, for both the purposes designated.

    Municipal Corporation Act of May 3, 1852, secs. 18, 34
       Swan's Stat., 960, 964.

    Vidal *v.* Girard, 2 How., 186, 187, 189, 190.

*Perin et al.* v. *Carey et al.*

McDonough *v.* Murdoch, 15 How., 406, 407.

Collins *v.* Hatch, 18 Ohio Rep., 524.

*Statutes of Ohio cited:*

Act of January 14, 1853, Ohio Laws, vol. 51, p. 503.

Act of March 14, 1853, Swan's Stat., 610.

Act of March 11, 1853, Swan, 988, 989.

Act of April 29, 1854, Swan, 991 a., 991 b.

Act of March 8, 1831, Swan 41.

Act of March 12, 1853, Swan, 43, 44.

Act of March 11, 1853, Swan, 588.

Philips *v.* Bury, 2 Term Rep., 353.

III. The city has capacity, as a corporation, to take by devise; whether she can hold the estate for the purposes designated or not, is a question with which the appellants have no concern.

Runyan *v.* Coster, 14 Pet., 122.

Goundie *v.* Northampton Water Co., 7 Penn. State Rep.. 239, 240.

Leasure *v.* Hillegas, 7 S. and Rawle, 320.

Sheaffe *v.* O'Neal, 1 Mass. Rep., 257, 258.

Fairfax *v.* Hunter, 7 Cranch, 603.

Coke upon Littleton, 2.

IV. The devises and bequests are for the benefit of whole denominations of persons, and to endow colleges and asylums particularly described; they are valid, in equity, therefore, without any trustee, and independently of the statute of Elizabeth.

McCartee *v.* the Orphan Asylum Society, 9 Cowen, 484.

Bartlett *v.* Nye, 4 Metcalf, 378.

Baptist Association *v.* Hart, 4 Wheat., 1.

Inglis *v.* the Sailors' Snug Harbor, 3 Pet., 99.

Vidal *v.* Girard, 2 How., 127.

McDonough *v.* Murdoch, 15 How., 367.

Smith *v.* Swormstedt, 16 How., 288.

McIntyre Poor School *v.* Zanesville Canal Co., 9 Ohio Rep., 203, 287.

*Statutes of Ohio cited:*

Act of May 3, 1852, concerning wills, sec. 67, Swan's Stat., 1034.

Act of March 26, 1856, " to provide for the government of schools and academies specially endowed," 53 Ohio Laws, 33, 34.

Act of March 11, 1853, " for the better management of orphan asylums," Swan's Stat., 588.

. Fontaine *v.* Ravenal, 17 How., 369. .

· Clark *v.* Taylor, 21 Eng. Law and Eq. Reports, 508.

Wheeler *v.* Smith, 9 How., 55.

V. McMicken's direction that certain real estate shall not be alienated, (section 32,) is only a condition subsequent ; and whether valid, or invalid, cannot affect the devise.

McDonough *v.* Murdoch, 15 How., 410, 411, 412.

VI. The persons intended as beneficiaries, by McMicken, are described with sufficient certainty.

Vidal *v.* Girard, 2 How., 192, 193, 196.

McDonogh *v.* Murdoch, 15 How., 414.

Whicker *v.* Hume, 14 Beavan, 509.

Pickering *v.* Shotwell, 10 Penn. State Rep., 23.

VII. The phrase "corporate authorities of the city of Cincinnati" affords an apt description of those by whom McMicken's bounty is to be administered.

Act of January 14, 1853, section 1, Ohio Laws, vol. 51, p. 503.

McIntyre Poor School *v.* Zanesville Canal Co., 9 Ohio Rep., 218.

VIII. It furnishes no ground for objection that the apportionment of bounty; as between the colleges and the asylums, will depend somewhat on circumstances, or even the discretion of the municipal authorities.

Vidal *v.* Girard, 2 How., 127.

McDonough *v.* Murdoch, 15 How., 367.

Pickering *v.* Shotwell, 10 Penn. State Rep., 23.

IX. The statutes of Ohio authorize such disposition of orphan and destitute children as the 36th section of McMicken's will contemplates.

Act of March 12, 1853, concerning apprentices and servants, secs. 1, 2, 3, 4, Swan's Stat., 43, 44.

Act of March 11, 1853, "for the better management of
  orphan asylums," sec. 2, Swan's Stat., 588.
Amendment of March 25, 1854, Swan's Stat., 588.

X. It furnishes no ground of objection that McMicken
stipulated for the preference of particular persons, as pupils
or beneficiaries, whether such persons be his own relatives or
the children of certain friends, or others.

  Attorney General *v.* Earl of Lansdale, 1 Simmons, 105.
  Wright *v.* Linn, 9 Penn. State Rep., 433.

XI. It is of no consequence whether the colleges intended
by McMicken be or be not within the act of April 9, 1852,
"to enable the trustees of colleges, academies, universities,
and other institutions for the purpose of promoting education,
to become bodies corporate," or its supplement of March 12,
1853, Swan's Stat., 193, 295.

The colleges need not be incorporated, inasmuch as the title
of all the property is vested in the city of Cincinnati, and the
city is a corporation with perpetual succession. If this were
otherwise, the act of March 26, 1856, would be amply suffi-
cient.

  Ohio Laws, vol., 53, p. 33.


The points made by *Mr. Taft* and *Mr. Perry* were the fol-
lowing:

I. The bequest of Mr. McMicken to the city of Cincinnati
creates a meritorious and well-defined charitable trust, which
is not subject to any just legal objection for vagueness or un-
certainty.

II. The city of Cincinnati has the legal capacity to take
the title of property given to her by deed or by will in trust
for a valid charity, though it be not certain that such trust
falls within the specified purposes of the corporation, in which
case the State only, and not the heirs, can intervene to prevent
her from holding the title and executing the trust.

III. The city of Cincinnati has capacity to acquire and hold
the property, and to execute the trust under this will.

IV. That, whether the city be capable or incapable as a trus-
tee, such uses as these in Mr. McMicken's will are good and

lawful uses by the common law of England, which is the common law of Ohio.

V. That such trusts are entitled to protection in equity upon general principles of equity jurisdiction, which protect all lawful trusts whether there be a trustee or not.

VI. That the original jurisdiction of courts of equity to protect and preserve such charitable trusts as this under Mr. McMicken's will has been recognised and thoroughly established, both by statute and by judicial decisions in Ohio, where it is now the settled law, as it is in nearly all the States of the Union.

The argument upon the first five points must be omitted, as was that of *Mr. Pugh.*

Upon the state of the law in Ohio, the argument was as follows:

4. Let us now examine the law of Ohio on this subject, as shown by her history, and expressed by her Legislature and her courts.

1. It is fair to presume that any one of the States where the common law of England prevails does and will protect its charities. They are descended from a country under whose laws and whose courts, in the days of their colonial connection with it, charity never failed. It is for the plaintiffs' counsel, therefore, to show that the State of Ohio, though deriving from England the great body of the common law, has rejected the English law of charities. The policy of Ohio, and all its historical associations and recollections, have been unqualifiedly in favor of the laws of charity, and especially of educational charity.

It is well known that Ohio was the first of the new States formed out of the great Northwestern territory to experience that most liberal policy, on the part of the Federal Government, which not only enjoined upon the Territorial Legislature the encouragement of learning, but made munificent grants of land for the uses of education.

By the 3d article of the ordinance of 1787, Swan's Statutes, (1st revision,) 46, it is provided, "that religion, morality, and knowledge being necessary to good government and the hap-

piness of mankind, schools and the means of education shall be forever encouraged."

By the act of 1785, Congress destined section 16 in every township to the support of schools, and section 29 of each township to the support of religion, and several entire townships were dedicated to the support of universities and academies.

Ohio was pledged, while yet in her tutelage, by the Federal Government, to an unreserved and fervent support and encouragement of all the means of education for all her people. These were the first vows required of her before she had formed her Constitution. It would have been ungrateful and unfilial, after these early pledges, if she had built up a Constitution and a system of laws excluding so important a "means of education" as these great educational charities like that of Mr. McMicken. She would have been false to her origin and to her early vows. But she has not been forgetful of her duty in that regard, as will appear by reference to her old as well as to her new Constitution, and to the laws enacted under them, and the decisions of her courts.

In 1799, the form of government was changed from the Governor and judges of the Territory to the Governor and Territorial Legislature.

On the termination of the first session held in Cincinnati, in 1799, the Legislature issued an address to the people, in which it says: "Religion, morality, and knowledge, are necessary to all good government. Let us, therefore, inculcate principles of humanity, benevolence, honesty, and punctuality in dealing, sincerity, charity, and all the social affections."

The lands devoted to educational purposes by Congress in the territory of which Ohio was formed amounted, in the aggregate, to more than a half a million of acres—a magnificent charity, created by the Federal Government itself; and yet it was not more certain in its objects than is this charity created by Mr. McMicken.

The object of the one and the other is identical. The General Government sought to encourage by these townships of land the highest grades of education.

When Congress gave this land for a university, it did not mean to limit the institution to a small Western college. It intended to say to the people of the State: Cherish your common schools, but do not neglect the universities.

If our Western institutions have failed hitherto to rank with the oldest and best-endowed universities of the East, it has been because they have lacked the accumulation of endowments to stimulate and encourage them. But if we follow out the original and oft-repeated injunction of the old Congress to the Territory, not only by applying these national charities strictly to their objects, but also by availing ourselves of the charities of benevolent individuals devoted to the same great purposes, we shall not long want the merit, though we may want the fame, of these ancient seats of learning.

And here we must be allowed to claim, as the first fruit of the first university founded on that early national charity, a lawyer and a statesman whose fame and influence have not been confined to his own State of Ohio or the West; who has been an ornament of the Senate and the Cabinet, and who still adorns the bar of the Union; an alumnus whom Harvard or Yale would be proud to claim.

It cannot be hoped that, by sustaining Mr. McMicken's charity, many specimens can be produced like the first graduate of the "Ohio University;" it is nevertheless to be hoped that many young men, sharing in his spirit, may grow up under the influence of these institutions to do honor to their age and country—men who will have character, and can afford to give calm counsel even amid the strife of parties and the fury of local jealousies.

By the 25th section of the same Constitution of 1802, page 38 of Swan's first revision of Ohio statutes, it is provided, "that no law shall be passed to prevent the poor in the several counties and townships within this State from an equal participation in the schools and colleges and universities within this State which are endowed, in whole or in part, from donations made by the United States for the support of schools and colleges; and the doors of said schools, academies, and universities, shall be open for the reception of scholars, students,

and teachers, of every grade, without any distinction or pref
erence whatsoever, contrary to the intent for which said dona-
tions were made."

It is worthy-of especial observation how perfectly the testa-
tor's will harmonizes with the policy of the State as well as of
the United States on the subject of education and educational
institutions. Neither the State nor the United States was con-
tent to limit its encouragement and support of education to
common schools. They provided for academies and universi-
ties.

By the 27th section of the same article it is provided, "that
every association of persons, when regularly formed within
this State, and having given themselves a name, may, on ap-
plication to the Legislature, be entitled to receive letters of
incorporation, to enable them to hold estates, real and per-
sonal, for the support of their schools, academies, colleges, uni-
versities, and for other purposes."

The new Constitution of 1851 is equally explicit and strong
in its encouragement of education. By the last clause of arti-
cle I, section 7, it is declared, that "religion, morality, and
knowledge, however, being essential to good government, it
shall be the duty of the General Assembly to pass suitable
laws to protect every religious denomination in the peaceable
enjoyment of its own mode of public worship, and to encour-
age schools and the means of instruction."

Article VI, section 1, of the same Constitution, provides:

"Sec. 1. The principal of all funds arising from the sale or
other disposition of lands or other property granted or intrust-
ed to this State for educational and religious purposes shall
forever be preserved inviolate and undiminished, and the in-
come arising therefrom shall be faithfully applied to the spe-
cific objects of the original grants or appropriations.

"Sec. 2. The General Assembly shall make such provisions,
by taxation or otherwise, as, with the income arising from the
school trust fund, will secure a thorough and efficient system
of common schools throughout the State."

The policy of the State is thus shown by its fundamental
law to have been, and to still be, to foster alike the common

*Perin et al.* v. *Carey et al.*

schools, the academies, and the universities, and to cherish
and protect every dollar which had been or might be donated
for any of these purposes.

The legislation of the State in behalf of schools, academies,
high schools, and colleges, has been voluminous, and institu-
tions of learning of every grade are encouraged, and all funds
donated or appropriated by law to these purposes are looked
after with extraordinary care.

By an act of 1838, (36 Ohio Laws, 35, sec. 43,) it was made
the duty of the general superintendent of schools "to take an
account of all funds and property given in any way for the
support of education, except chartered colleges, and report the
condition of the same annually to the Legislature;" "and
where, in his opinion, waste is committed, or about to be com-
mitted, either by misuser or nonuser, he may report the same
to the prosecuting attorney of the county," &c., "and such
proceedings shall be had by injunction, decree, or otherwise,
as shall prevent misuser of such property, and carry into effect
as near as may be the object of the trust."

In 1852, when the office of attorney general of the State was
created, this duty of looking up charities was cast upon him,
and the office of general superintendent of schools was abol-
ished at the same time, and the act above quoted was repealed.

By the act of 1852, "to prescribe the duties of the attorney
general," (Swan's Stat., 51—2, sec. 14,) it is provided, "that
it shall be his duty to cause proper suits to be instituted at
law and in chancery to enforce the performance of trusts for
charitable and educational purposes, and restrain the abuse
thereof, whenever, upon the complaint of others, or from his
own knowledge, he may deem that to be advisible, or when-
ever by the Governor, the Supreme Court, or either house of
the General Assembly, he may be directed so to do, which said
suits may be brought in his own name, upon behalf of the
State or the beneficiaries of the trust, in the court of Franklin
county, or in the court of common pleas of any county wherein
the trust property may be situated or invested; and which suit
shall not abate nor discontinue by any change of the officer,
but shall be prosecuted to final judgment, mandate, or decree,

as if no such change had occurred: provided, however, that the attorney general may refuse to institute proceedings as aforesaid, except when directed by the Governor, the Supreme Court, or either house of the General Assembly, unless some responsible freeholder of the State will become relator in the cause and liable for the costs thereof; but whenever the Governor, the Supreme Court, or either house of the General Assembly, may direct any such suit, he shall cause the same to be commenced and diligently prosecuted, without any other relation."

Now, although the act of 1838, creating the general superintendent and assigning to him so specifically his duties, was repealed when the attorney general act was passed, it is not to be supposed that the repeal of that act affected in any manner the validity of "all funds and property in any way given for the support of education, except chartered colleges," the condition of which the superintendent was to report annually to the Legislature; and in case of apprehended waste, report the same to the prosecuting attorney, who was to cause such proceedings to be had by injunction, decree, or otherwise, as should prevent misuse of such property, and carry into effect, as near as might be, the object of the trust." Neither the superintendent's act nor the attorney general's act gave validity to the educational and charitable trusts, nor did the repeal of the former act impair that validity, but its enactment was evidence of the recognition and existence of that kind of trusts. They are all trusts which have an object given them by the donor; and it is provided that if they cannot be carried out strictly according to the gift, "it shall be carried out as nearly as may be." This is an accurate description of the *cy pres* mode of proceeding, and shows that, in Ohio, even if it be not practicable to carry out the purpose of the gift precisely as specified by the testator, it is valid nevertheless as a charity, and to be carried out "as nearly as may be." No Legislature in Ohio would presume by statute, in an indirect way, to take from heirs and next of kin property which by the law of the land belonged to them. Nothing could more strongly show that the doctrine by which chancery aids charities is fully

recognised in Ohio as an existing, unquestioned judicial principle, to enforce which the Legislature may prescribe different remedies at different times, without in any manner leaving the right itself doubtful.

And even if no remedy at all were provided by statute, the right itself would not be lost, but would remain; and whenever it should come before a tribunal competent to protect and enforce it, it would no longer be dormant. In 2 How. R., 196, Vidal *v.* Philadelphia, the court passed upon a similar question. They say: "Whatever doubts, therefore, might properly be entertained upon the subject when the case of the Trustees of the Philadelphia Baptist Association *v.* Hart's executors, 4 Wheat., 1, was before this court, (1819,) those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded."

"If, then, this be the true state of the common law on the subject of charities, it would, upon the general principle already suggested, be a part of the common law of Pennsylvania. It would be no answer to say that if so it was dormant, and that no court possessing equity powers now exists, or has existed, in Pennsylvania, capable of enforcing such trusts. The trusts would nevertheless be valid in point of law, and remedies may from time to time be applied by the Legislature to supply the defects. It is no proof of the non-existence of equitable rights that there exists no adequate legal remedy to enforce them. They may slumber, but they are not dead."

It is clear that the Legislature of Ohio intended by the "act to prescribe the duties of attorney general," passed 1852, to provide for the preservation of "proceeds of property given in any way for the support of education," which was protected by the act of March 7, 1838, "for the support and better regulation of common schools, and to create permanently the office of superintendent," above recited, as well as for other charities. Trusts for charitable and educational purposes are terms which have a judicial meaning, which the Legislature undoubtedly had in view. If the trusts intended were only such as had a *cestui que* trust in being capable of suing, why was the significant word "charitable" used? If it was intended to

protect only trusts which needed no such aid as charities are known to need, why did not the Legislature say, "it shall be his duty to cause proper suits to be instituted to enforce the performance of trusts in which the public has an interest?" It is true that the public have an interest in charities. But it would seem as if the Legislature sought to use language that was not doubtful—language which had a well-understood historical as well as judicial meaning.

What more did the statute of Elizabeth itself enact than this law of Ohio? The statute of Elizabeth was entitled, "An act to redress the misemployment of money heretofore given to certain charitable uses;" and it provides a remedy for abuses of such trusts. In the preamble it enumerates twenty different kinds of charities, and this preamble has in modern times been referred to, both in this country and in England, as containing all the charities which are entitled to the aid of a court of equity as such, except, perhaps, some which are considered as falling within the spirit and meaning of the enumeration.

The cases of dedication have been regarded in Ohio as involving the same principle as the cases of charity, and this identity of principle has been often recognised in this court.

It is said by the counsel for the plaintiff that a dedication is founded on an estoppel against claiming property which has been dedicated, while a charity presumes a grant. But whether it be called an estoppel or a preumed grant is quite immaterial; the result is the same, and the principle of favor to the object is the same, and the trust in both cases is preserved without a legal grantee on precisely the same ground of favor in equity. A grantee with warranty, whose grantor had no title at the time of conveyance, takes by estoppel the benefit of any subsequent purchase of the title by the warrantor. But if there were no grantee, the estoppel would not pass the title any more than any other mode of passing title. There must be a grantee in whose favor an estoppel can operate, unless it be for public, pious, or charitable uses. Estoppel is a distinct mode of acquiring title. But it does not in

any manner affect the question whether a grantee is necessary to a valid transfer of title.

The courts, therefore, are entirely correct in regarding public, pious, and charitable uses, in States where the statute of Elizabeth is not in force, as falling under one and the same rule, and entitled to the same favor in a court of chancery. And even in England, where the statute of Elizabeth was in force, dedications have from time immemorial been protected and preserved with equal favor as charities. This circumstance does, of itself, furnish a strong argument in favor of the original jurisdiction of the court of chancery over charities. All these purposes are of public interest, and for that reason have ever been regarded as entitled to especial favor. They all stand upon the same principle, and it is now too late to dispute that all gifts for public, pious, or charitable purposes are entitled to peculiar favor in courts of equity.

We will now examine some of the cases which have been decided in Ohio, and we claim that those cases show conclusively that all the doctrines in favor of charities which have been adopted anywhere in this country, whether by this court or any State court, have been entertained and freely adopted, without the slightest hesitation or doubt, in Ohio. This is what should be expected of Ohio, from its origin and history, as we have shown it.

Another consideration would lead to the same expectation. Ohio, though the oldest of the Northwestern States, is young, and comparatively destitute of those public benefactions which come from the growth, in wealth and civilization, of a prosperous country. Neither Ohio nor any of the Western States could afford to reject any of those rare bounties, which, like angels' visits, are few and far between in a young country, whose wealth is far more in hope and prospect than in present enjoyment.

We may therefore safely say that there is not to be found a decision or a dictum in any Western State, not only which is not friendly to charities, but which does not sustain the most liberal doctrines as to the original chancery jurisdiction over charitable bequests; and that there has never been a case

known in the West of a trust for any charitable object so uncertain that it has not been sustained. The Western courts have not waited for an English statute to countenance them in carrying the good and noble purposes of such of their citizens as have remembered the poor and the young and ignorant in the disposition of their surplus wealth.

And even in all the Southern States, if we except Louisiana, which has a code peculiar to itself, charities are upheld liberally and steadily.

In this remark we do not include Virginia, as to whose present position on the subject we shall have some remarks before closing.

But if we commence with North Carolina, and pass to South Carolina, and to Georgia, Alabama, and Mississippi, we shall find that in each and all of those States their supreme courts have spoken out decidedly in favor of charities. If we then come up to Tennessee, and on to Kentucky, we find some of the most able and satisfactory opinions expressed on the subject, all in favor of the most beneficent principles of charity. The Arkansas courts have taken the same ground on the subject; and Missouri we are happy to be able now to add to the list. And in all these States which have been now named, it is not only true that the conclusion has been in favor of charities, but there is not to be found a dictum or a decision in their jurisprudence adverse to charities, or expressing doubt or hesitation on the subject.

It is not a matter of surprise, therefore, that the very learned and experienced counsel for the plaintiff should not resort to the courts of Ohio in their attempt to overthrow this bequest. Indeed, the senior counsel for the plaintiff has already had experience of the way in which all Ohio courts regard objects of charity, and how it cures defects of legal title, and supplies trustees in aid of a charity, especially an educational charity; and how it has never suffered an opportunity to pass in which a charitable donation is involved, however remotely, but it has shown its unqualified favor to its support and the carrying it fully into effect, without ever expressing the slightest doubt of its original jurisdiction over the whole subject. The

enforcement and preservation of charities has prevailed over all idiosyncracies of judges on all the benches of the West, and of all the other common-law States except Virginia and Maryland.

The counsel then commented on the following cases:

Brown *v.* Manning, 6 O. R. R., 298; decided in 1834.

Le Clerc *v.* Gallipolis, 7 O., 1st pt., 217; decided in 1835

Lessee of Bryant *v.* McCandless, 7 O. R., 2d pt., 135.

Morgan *v.* Leslie, Wright's Supreme Court Reports, 144.

Webb *v.* Moler, 8 O. R., 548.

Trustees of McIntyre Poor School *v.* the Zanesville Canal and Manufacturing Company, 9 O. R., 203; decided in 1839.

Miles *v.* Fisher, 10 O. R., 1.

Ohio *v.* Guilford, 15 O. R., 593; 18 O. R., 500.

Zanesville Canal and Manufacturing Company *v.* the City of Zanesville; 20 O. R., 483.

Urmey's Executors *v.* Wooden, 1 O. S. R., 160; decided in 1853.

Williams *v.* the First Presbyterian Society of Cincinnati; 1 O. S. R., 378.

Mr. Justice WAYNE delivered the opinion of the court.

The appellants here were the complainants in the court below.

The object of their bill is to set aside the devises and bequests in the will of Charles McMicken to the city of Cincinnati, in trust for the foundation and maintenance of two colleges.

The testator says: "Having long cherished the desire to found an institution where white boys and girls may be taught, not only a knowledge of their duty to their Creator and their fellow men, but also receive the benefit of a sound, thorough, and practical English education, and such as might fit them for the active duties of life, as well as instruction in all the higher branches of knowledge, except denominational theology, to the extent that the same are now or may be hereafter taught in any of the secular colleges or universities

of the highest grade in the country, I feel grateful to God that through His kind providence I have been sufficiently favored to gratify the wish of my heart. I therefore give, devise, and bequeath to the city of Cincinnati, and its successors, for the purpose of building, establishing, and maintaining, as far as practicable, after my decease, two colleges for the education of boys and girls, all the following real and personal estate, in trust forever, to wit:" describing the property in nine clauses of the thirty-first article of the will.

He then proceeds to declare that none of the real estate devised, whether improved or otherwise, or which the city may purchase for the benefit of the colleges, should at any time be sold, but that the buildings upon any part of it should be kept in repair out of the revenues of his estate. In the event, however, of dilapidation, fire, or other cause, or if it shall be deemed expedient to have a larger income, he directs houses to be taken down, and that they are to be rebuilt out of the income of his estate. He further authorizes purchases to be made of other property, buildings to be put up on his vacant lots, and designates a part of the eastern boundary of the grounds devoted to the college for the boys for the erection of boarding houses for the accommodation of the students, from which a revenue may be derived. The testator then declares where the colleges shall be located, that there might be a separation between that for the boys and that for the girls. There are other particulars under this article of the will which we need not recite, as they have no bearing upon the controversy made by the bill. Passing over the 33d article of the will for the same reason, the next article in the will is a direction that the Holy Bible of the Protestant version, as contained in the Old and New Testaments, shall be used as a book of instruction in the colleges. Next, it is declared that in all applications for admission to the colleges, that preference should be given "to any and all of the testator's relations and descendants, to all and any of his legatees and their descendants, and to Max McMicken and his descendants." Then he directs: "If, after the organization and establishment of the institution," and the admission of as many pupils as in the discretion of

the city have been received, there shall remain a *sufficient surplus of funds*, that the same shall be applied to making additional buildings, and to the support of poor white male and female orphans, neither of whose parents are living, &c., &c., preference to be given to my relations and collateral descendants, &c., &c.; that they were to receive a sound English education, &c., &c.; and afterwards, directions are given as to the mode of receiving such poor white male and female orphans, and the privileges to be allowed under certain circumstances. The testator, in the thirty-fourth article of his will, declares that "the establishment of the regulations *necessary to carry out the objects of my endowment I leave to the wisdom and discretion of the corporate authorities of the city of Cincinnati, who shall have power to appoint directors to said institution."* The last article of the will relates to the devises and bequests to the city, and directions as to paying the accounts of the trust. The testator then nominates executors, and they are the appellees in this appeal.

This statement has been made, that the devises and bequests of the testator may be fully disclosed, and the merit of them as a charitable use may be fully understood.

Our first observation is, that it was his intention to establish primarily two colleges for boys and girls, and then a third for the support of poor white male and female orphans, neither of whose parents were living, and who were without any means of support, who were to receive a sound English education. This third school was to be founded by applying to the purpose the surplus funds which might remain after the complete organization of the colleges. (36th article of the will.) The testator anticipated that there would be such a surplus, as he left it in the discretion of the city to determine the number of the pupils who were to be admitted to the colleges. We must then keep in mind the thirty-first and thirty-sixth articles of the will in considering it, though they are but contingently connected by the happening of a surplus in the way just mentioned. For, now, if the first is subject to a failure as a gift for charitable purposes, the devises and bequests may be good under the second. Our attention, however, will be

chiefly given to the thirty-first section and its clauses, as under that it was principally argued by counsel.

The learned sergeant, Sir Francis Moore, who drew the statute of 43 Elizabeth, chapter 4, says, in his exposition of it: "As in all other grants, so in a gift to a charitable use, four things are principally to be considered: 1. The ability of the donor. 2. The capacity of the donee. 3. The instrument or means whereby it is given. 4. The thing itself which is or may be given to a charitable use." And then, by way of caution to donors, he says: "There are five things which cannot be granted to such a use: 1. Things that yield no profit. 2. Things that are incident to others, and inseparable. 3. Possibilities of interest. 4. Conditions—meaning that such things are from their nature insusceptible of serving such a purpose;" and then he adds the 5th: "Copyholds, if in any way prejudicial to the lord." We shall not consider them numerically, but both seem to be the natural way to discuss such a gift, when its validity is disputed. We shall follow it in those particulars as briefly as we can.

No question is made, however, in this case, as to the execution of the will, nor as to the capacity of the devisor. It is insisted, though, that the devises and bequests to the donee, the city of Cincinnati, are void, because the city has not the capacity to take them, and also that they create a perpetuity from being inalienable, which is contrary to law.

Charity, in a legal sense, is rather a matter of description than of definition; and the word perpetuity in law is only determined by the circumstances of such cases. But for the purposes of this case, the objection to the validity of the charity on account of its perpetuity, we will place under Mr. Sander's definition in his Essay upon Uses and Trusts, 196: "A perpetuity may be defined to be a future limitation, restraining the owner of the estate from aliening the fee of the property, discharged of such future use or estate, before the event is determined or the period is arrived when such future use or estate is to arise. If that event or period be within the bounds prescribed by law, it is not a perpetuity." It is then a limitation upon the *jus disponendi* of property, *upon the common-law*

*right of every man to dispose of his land "to any other private man at his own discretion."* And one class of those limitations is technically termed alienation in mortmain, and to charitable uses. Alienation in mortmain, in its primary signification, is an alienation of lands or tenements to any corporation, aggregate, ecclesiastical, or temporal, the consequence of which in former times was, that by allowing lands to become vested in objects endued with perpetuity of duration, the lords were deprived of escheats and other feudal profits, and the *general policy of the common law, which favored the free circulation of property, was frustrated, although it is true that at the common law the power of purchasing lands was incident to every corporation.* The effect of these statutes deprived every corporation in England, spiritual or secular, from acquiring, either by purchase or gift, real property of any description, without a general license from the Crown enabling it to hold lands in mortmain, or a special license in reference to any particular acquisition. These restraints were subsequently relaxed in many particulars, including gifts to a corporation for purposes of education. But this case does not require us to particularize them; our only purpose for having alluded to statutes of mortmain being to show, from the view taken of them from an early day by the courts in England, that devises to corporations, which generally cannot take lands under a will, were held good when made in favor of charities, and that such gifts, from the purposes to which they were to be applied, and the ownership to which they are subjected, have had the protection of courts of equity to prevent any alienation of them on the part of the person or body interested with the offices of giving them effect; and that in all such cases land has been decreed by courts of equity to be practically inalienable, or that a perpetuity of them exists in corporations when they are charitable gifts. Hillam's case, Duke, 80, 375; Mayor of Bristol v. Whitton, 1633, Duke, 81, 377; Mayor of Reading v. Lane, 1601, Duke, 81, 361; Lewis on Perpetuity, 684; 1 Macnaghten and S. Gordon, 460; Chart. Hospital v. Granger; Griffin v. Graham, 1 Hawks, 130; State v. Girard, 2 Ired. Eq. R., 210. The objection that the devises and bequests create a perpetuity cannot be maintained

unless they are forbidden by the law of Ohio. And if a perpetuity was forbidden, the charitable trust would not fail, but would be held good and carried out in equity.

We were told that the first and second sections of the 13th article of the Constitution, in connection with the legislation of the State under them, prevent an estate in perpetuity from being made in Ohio. And for showing the bearing of them upon this case, we were referred to an act of Ohio to restrain the entailment of real estates. 2 Swan, secs. 355—6.

We are unable to see any fair connection between them. The first and second sections of the 13th article of the Constitution were, that the General Assembly shall pass no special act conferring corporate powers. Sec. 2. Corporations may be formed under general laws, but all such may from time to time *be altered or repealed*—that is, though they may be formed under general laws, that the Legislature may alter or repeal them. That by the provision they meant to retain their legislative powers to give larger powers than a corporation might have had, to reform them in any particular that might become necessary, that of the violation of a contract excepted. The act to restrict the entailment of real estates obviously applies to individuals exclusively, and not at all to corporations, and especially to such of them as may take and hold charitable gifts in perpetuity.

The first act passed under the Constitution of 1851, relating to corporations, was to enable the trustees of colleges, academies, universities, and other institutions for promoting education, to become bodies corporate. We will give it in its terms, for nothing in the legislation of that State can show more satisfactorily than it does that public spirit there is in harmony with, and fully up to, that of the age upon the subject of education. The language of the 1st section is, that any number of persons, not less than five, desiring to establish a college, university, or other institution for the purpose of promoting education, religion or morality, agriculture and the fine arts, may, by complying with the provisions of the act, become a body corporate and politic, with perpetual succession, and may assume a corporate name, by which they may sue and be sued, plead

and be impleaded, in all courts of law and equity; may have a corporate seal, and the same alter or break at pleasure; *may hold all kinds of estate, real, personal, and mixed,* which they may acquire by *purchase, donation, devise, or otherwise,* necessary to accomplish the *objects* of the corporation; and further, the trustees of any university, college, or academy may hold in trust any property devised, or bequeathed, "*or donated*" to such institution, upon any specific trust consistent with the objects of said corporation; also, when any number of persons shall have procured by subscription, donation, or devise, purchase, or otherwise, the sum of five hundred dollars, for the purpose of establishing an academy, they may become a body corporate, &c., &c., and do all acts and things necessary for the promotion of education and the general interests of such academy. Time and the occasion will not permit us to give more of this liberal and enlightened statute, and of the supplemental acts passed in August, 1852, and March, 1853. 2 Swan, secs. 195, 196.

There is nothing in either of them in any way interfering with the power of *before existing* corporations, to become the trustees of charitable devises and bequests for education, and to hold them in perpetuity. There is rather a disposition manifested to enlarge and confirm their power to do so, and to give to other corporations under the act certainty and security in the administration of such trusts. The Legislature has succeeded in giving to corporations, for the promotion of education, what the learned gentlemen who brought this bill said were the requisites of a corporation: lawful existence; artificial capacity and perpetuity of existence; and, we add, the unquestioned enjoyment of all these privileges, which courts of equity have said for more than two hundred years they were entitled to, in the construction of devises and gifts for charity, and for the administration of them.

It was conceded in the argument, that the trusts in this will fall within the description of public trusts or charitable uses, as recognised in England since the statute of 43 Elizabeth, c. 4, notwithstanding that statute is not in force in Ohio, *and, in our opinion, never was, as we shall show presently.*

Charities had their origin in the great command, to love thy neighbor as thyself. But when the Emperor Constantine permitted his subjects to bequeath their property to the church, it was soon abused; so much so, that afterwards, when it became too common to give land to religious uses, consistently with the free circulation of property, the supreme authority of every nation in Europe, where Christianity prevailed, found it necessary to limit such devises by statutes of mortmain.

In France, by the ancient constitutions of that kingdom, churches, communities, chapters, colleges, convents, &c., were not permitted to acquire or hold immoveable property. Dumoulin sur 1st art., 51 De la Cou., Paris. This incapacity after a long time was relaxed, and they were allowed to hold by license of the King.

In Spain, the communities mentioned before could neither acquire nor hold property, unless by authority of the Sovereign; but in *England, corporations had the capacity to take property by the common law.* Co. Litt., 99. They were rendered incapable of purchasing without the King's license by a succession of statutes from Magna Charta, 9 Henry 3, to 9 Geo. 2.

They are known as the statutes of mortmain; that is, as it was the privilege of any one, before such statute restrained it, to leave his property of every kind by testament to whom he pleased, and for such purposes, charitable or otherwise, as he chose; and the will was, in every particular, administered according to the testator's intentions, *sometimes by the courts of common law, and at others by a court in chancery,* as may be seen from the cases in Duke and other writers upon charities. The question, then, under such a condition of the law in Ohio, where there was no statute of mortmain, cannot be in this case, whether chancery had such a jurisdiction, or whether Ohio had adopted in whole or in part the common law, but whether Ohio, in the construction of her judicial system, did not mean to give to those courts which were to have equity jurisdiction cognizance of trusts made by wills for charitable uses, as well as of other trusts; and whether the judges in Ohio have not uniformly entertained it upon that principle. We cannot be mistaken in the conclusion that they have done

so from the cases cited on both sides in the argument of this case, the larger number of which we have verified by examination.

And we are more confirmed in what has just been said, for the English statutes of mortmain were never in England supposed to have been meant to extend to her colonies, and were never in force in those of them in America which became independent States, but by legislative adoption.

First, it will be observed in all commentaries upon those statutes they are termed local or political laws, meant to suppress a public mischief and abuse in England. The statute of 43 Elizabeth is entitled, "An act to redress the misemployment of lands, goods, and stocks of money, heretofore given to charitable uses." The mode and manner for the enforcement of it in any particular did not exist in any one of the English colonies. There was not in either of them a Lord Keeper or Lord Chancellor, or any corresponding officer to mature the regulations enjoined by the act for its enforcement. There were not in the colonies any abuses to redress for the misemployment of lands, goods, or money heretofore given to charitable uses; further, there were not then in any one of them those religious institutions which the monarchs of Europe deemed it politic to restrain from holding lands.

The statute, after beginning with a statement of the abuses to be controlled, declares that for the redress of them it shall be the duty of the Lord Chancellor or Lord Keeper of the great seal for the time being, and for the Chancellor of the Dutchy of Lancaster for the time being, to award commissions, &c., into all or any part of the realm, for the purpose of executing the, &c., statute, and the realm or *kingdom of England,* in statutory parlance, as well in the time of Elizabeth as, now, "meant the kingdom over which her municipal laws or the common law had jurisdiction, and did not include either Wales, Scotland, or Ireland, or any other part of the King's dominions, except the territory of England only." 1 Blackstone's Commentaries, sec. 4, p. 93, Wendell.

And in the same section, after having enumerated those dominions which had been subjected by statute or otherwise

to the laws of England, and such as had not been, all being adjacent to England, Blackstone says, our more distant plantations in America or elsewhere are also in some respects subject to English law. But that must be understood with very many and very great restrictions. Such colonies carry with them only so much of the English law as is applicable to their own situation and the condition of an infant colony; such, for instance, as the general rules of inheritance and of protection from personal injuries. Pp. 107, 108 Marginal. But we are not left to inferences to establish the locality of the operation of the statutes of mortmain to England, and that they never had any force in the colonies. The whole subject in all its generality was ably discussed and decided in the high court of chancery in England some forty years since. In that case, 2 Merivale, 143, the Attorney General *v.* Stewart, the question being whether the statute of mortmain, 9 Geo. II, extended to the island of Grenada, in the West Indies, it was ruled that it did not, and that none of the English mortmain acts were of force in the colonies.

Without, then, a particular enactment for such purpose, the statute of 43 Elizabeth, c. 4, could never have been in force in Ohio. Nor do we think it to be a point of judicial uncertainty there, for we cannot find a decision in the courts of Ohio directly declaring that it ever was.

The law was adopted in terms from the statute of Virginia by the Governor and judges of the Territory. 1 Chase, 190. Whatever may have been its validity in other respects, it did not comprehend the statute of Elizabeth. For though it was a remedial statute to correct abuses, it was a restraining statute of the common-law right of every man to dispose of his property by will as he pleased. The law taken from Virginia for Ohio made statutes and acts of Parliament *in aid* of the common law, which were of a general nature, and not local to that kingdom, of force in Ohio. It was not in aid of the common law, but being restrictive of it, it should have, as to the places assigned for its operation, a strict interpretation.

But whether we are right or not so, in respect to the law adopted from Virginia, and passed in the Territorial Legisla-

ture of Ohio, it is certain that in the year 1806 it was repealed; and that since the statute of Elizabeth has had no force in Ohio as a statute, though the judges of that State, without any assumption, have applied its principles to all cases of charitable devises as a part of chancery jurisdiction. It certainly was right in them and a duty to carry out the charitable intentions of a testator by the same principles that his will was executed in every other respect, when the Legislature was silent in respect to such devises, or had given no other rule concerning them.

No more was done by them in Ohio than was done in every other State in this Union where the statute of Elizabeth had not been adopted by legislative enactment.

But in justice to the subject we cannot leave it without saying that original chancery jurisdiction over charities existed in England, and was exercised there, before the statute of Elizabeth was passed; also, that it has now become an established principle of American law, that courts of chancery will sustain and protect such a gift, devise, or bequest, or dedication of property to public charitable uses, provided the same is consistent with local laws and public policy, where the object of the gift is a dedication specific and capable of being carried into effect according to the intentions of the donor. In confirmation of this we refer to the cases collected in Angell and Ames upon Corporations, private and aggregate, 6th edition, 182, 177, and from pages 170 to 180, inclusive.

And this court, in Vidal et al. *v.* Mayor of Philadelphia et al., reviewed its opinion to the contrary of what has just been said in the case of the Baptist Association *v.* Hart's executors, and admitted, whatever doubts had been expressed in that opinion, that they had been removed by later and more satisfactory sources of information.

And in Vidal's case the court went on to say: It may, therefore, be considered as settled, that chancery has an original and necessary jurisdiction in respect to devises and bequests in trust to persons competent to take for charitable purposes, when the general object is specific and certain, and not contrary to any positive rule of law. 2 Kent's Comm., 287, 288,

4 edition; Gibson *v.* McCall, 1 Rich. S. C., 174; Att'y General *v.* Jolly, ibid., 176, N.; Sohun *v.* Wardens and Trustees of St. Paul's Church, 12 Met. Mass. R., 250; Beall *v.* Fox, Georgia R., 404; Miller *v.* Chittenden, 2 Clarke, Ia.; and Williams *v.* William, Opinion by Judge Denio, 4 Selden, 525. We also refer to the opinion of Mr. Justice Baldwin, which led the way upon this question of jurisdiction in the United States in the will of Sarah Zane in pamphlet; Cir. Co. in Pennsylvania, April term, 1833; and to Mr. Justice Story's Essay in the Appendix to 3 Peters's S. C. R., 481 to 502, inclusive.

The same results have been announced by the decisions in Ohio. The Trustees of the McIntyre Poor School *v.* the Zanesville Canal and Manufacturing Co., 9 Ohio R., 203, does so. Lane, C. J., avoiding the discussion of the extent of chancery jurisdiction over charities independently of the statute, says: But one of the earliest claims of every social community upon its law-givers is an adequate protection to its property and institutions, which subserve public uses, or are devoted to its elevation, &c.; and, in a proper case, the courts of one State might be driven into the recognition of some principle analogous to that contained in the statute of Elizabeth as a necessary element of our jurisprudence. But without reference to these considerations, where a trust is clearly defined, and a trustee exists capable of holding the property and executing the trust, it has never been doubted that chancery has jurisdiction over it by its own inherent authority, not derived from the statute, nor resulting from its functions as *parens patriæ.* The same ruling was made afterwards in 15 Ohio R., 593, and in 18 Ohio R., 500, and the main point in both of them could not have been decided without maintaining the jurisdiction in chancery over charitable uses, independently of the statute of Elizabeth. The same may be assumed of the case growing out of the will in 20 Ohio R., 483. Indeed, it was assumed that no case in Ohio of a charitable trust has been judicially maintained, or could have been valid under the universal admission that the statute of the 43 Elizabeth, c. 4, was not in force in Ohio, unless the courts

there had acted from the conviction that in such cases chancery had a jurisdiction over them by its own authority.

We shall now consider the objections which were made by the counsel for the appellants to the validity of the devises and bequests of Mr. McMicken, that the city of Cincinnati has not the capacity to take them and to execute the trusts of the will, and that no other trustee can be appointed.

In our view, the answers to them from the opposing counsel were decisive. No incapacity of the city of Cincinnati to take in this instance can be inferred from its charter. It has the power to acquire, to hold, and possess, real and personal property, &c., &c., and to exercise such other powers and to have such other privileges as are incident to municipal corporations of a like character and degree, not inconsistent with this act or the general laws of the State. Swan, 960. It was admitted in the argument, that the section just read confers power upon the city to acquire and hold real estate for the legitimate objects of the city. These objects are enumerated in many particulars directly connected with its powers to govern the city, and in the nineteen sections following that cited there is not a sentence or word from which an inference can be made that the Legislature meant to deprive the city of Cincinnati from taking and administering charitable trusts. Indeed, such a course would have been inconsistent with the Legislature's caution in its enactments under the Constitution of 1851. It would be doing great injustice to the Legislature even to suppose that it meant, in passing an act for the government of corporations, under the provisions of the Constitution, that it designed to encroach upon that of the judiciary, or to alter the whole power of chancery in respect to charitable uses, and the long-established practice of corporations, private and municipal, to receive them as trustees, and to administer them according to the intention of donors. So far from any intention to interfere with such a privilege in the city of Cincinnati, we infer from previous and subsequent legislation that it was to have an important agency in carrying out the 6th article of the Constitution in respect to education. We allude to the act for the better organization and classification

of the common schools in Cincinnati and Dayton, passed in the year 1846, (Ohio Local Laws, 91,) and to that of the 27th January, 1853, both now in force. In the first, the trustees and visiters of common schools in the city of Cincinnati, with the consent of the city council, have the power to establish and maintain out of any funds under the control of the trustees and visiters such other grades of schools than those already established as they may deem expedient for such purpose. Further, by the 68th section of the State School Law, Swan, 852, passed in January, 1856, power is given to township boards of education, and their successors in office, to take and hold in trust for the use of central or high schools, or subdistrict schools, in the township, any grant or donation, or bequests of money, or other personal property, to be applied to the support of such public schools. Again, in Ohio Laws, 33, March 26, 1856, it is declared that whenever any one gives lands or money for the endowment of a school or academy, not previously established, and shall not provide for the management of it, that the Court of Common Pleas shall appoint trustees with corporate powers. That act provides also for the management of charities when the founders have not given directions; and another act, Swan, 193, 1856, provides how colleges may be incorporated by their own act, and how trustees of an endowment may also become a corporation by their own act. These acts have been cited to show that Ohio, in her legislation, has made municipal corporations trustees for charity devises and bequests, and that the management of them is a duty. They also prove that the privilege to take them is one given and imposed by law.

After a close examination of all the legislation of Ohio relating to corporations, and its system of education, we have not been able to detect any sentence or word going to show any intent to alter the law as it stood before the adoption of the Constitution of 1851, in respect to a corporation receiving and taking, either by testament or donation, property for a charity, or to prevent them from having trustees for the execution of it according to the intention of the donor. To take such privileges from them can only be done by statute expressly, and

*Perin et al. v. Carey et al.*

not by any implication by statutes, or from any number of sections in statutes analogous to the subject, containing directions for the management of corporations. The law is, that where the corporation has a legal capacity to take real or personal estate, then it may take and hold it upon trust in the same manner and to the same extent as private persons may do. It is true that if the trust be repugnant or inconsistent with the proper purposes for which it was created, that may furnish a good reason why it may not be compelled to execute it. In such a case, the trust itself being good, will be executed under the authority of a court of equity. Neither is there any positive objection, in point of law, to a corporation taking property upon trust not strictly within the scope of the direct purposes of its institutions, but collateral to them, as for the benefit of a stranger or another corporation. But if the purposes of the trust be germain to the objects of the corporation, if they relate to matters which will promote and perfect these objects, if they tend to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry, and happiness, where is the law to be found which prohibits the corporation from taking the devise upon such trust in a State where the statutes of mortmain do not exist, the corporation itself having an estate as well by devise as otherwise? We know of no authority which inculcates such a doctrine, or prohibits the execution of such trusts, even though the act of incorporation may have for its main objects mere civil and municipal government and powers. 2 How., 190. This court announced the same principle again in the case of McDonough v. Murdoch, 15 How., 367, with other and new illustrations, and with direct reference to the capacity of a corporation to take such trusts, if within its general objects, or such as were collateral or incidental to its main purpose. There is nothing in the Ohio statute of wills to prevent corporations from taking by devise. Much was also said in the argument denying the legality of the trusts, in consequence of the uncertainty of the beneficiaries, and because the relatives of the testator were to have the preference. As to the first, white boys and girls make as

distinctive a status of a class who are to be the first benefici-
aries of the trust, and the words in the 36th section, that "if
any surplus shall remain, &c., it shall be applied to the sup-
port of poor white male and female orphans, neither of whose
parents are living, and who are without any means of sup-
port," make as certain a description as could have been ex-
pressed.

It seems to us, now, that the objection relative to the con-
dition of the beneficiaries is at variance with the established
primary rule in respect to a charity, not only with refer-
ence to the statute of 43 Elizabeth, c. 4, but to a charity
under the common law. The answer is, that a charity is a
gift to a general public use, which extends to tne rich, as well
as to the poor. Jones *v.* Williams, Amb., c. 651. Gen-
erally, devises and bequests having for their object establish-
ments of learning are considered as given to charitable uses,
under the statute of Elizabeth, Attorney General *v.* Earl of
Lansdale; but that does not make a devise good to a college
for purposes not of a collegiate character, intended chiefly to
gratify the vanity of the testator. And we cannot be mistaken,
that a devise to a corporation in trust for any person is good,
and will be effectuated in equity. 1 Bro. Ch. Cas., 81. And
*a fortiori*, a devise to a charitable corporation, in trust for any
other charitable use, would be good. All property held for
public purposes is held as a charitable use, in the legal sense
of the term charity. Law Library, vol. 80, p. 116, Grant on
Corporations.

We will not pursue the subject further; for, without having
discussed either of the six objections made in the bill of the
complainants, or the points made by counsel in support of the
demurrer to the bill, numerically, both have been under our
examination; for all were appropriately in the argument of
the cause, and in this opinion we meant to decide all of them,
and have done so.

We cannot announce them more expressively than they
were urged in argument:

1. The doctrines founded upon the statute of 43 Eliza-
beth, c. 4, in relation to charitable trusts to corporations,

either municipal or private, have been adopted by the courts of equity in Ohio, *but not by express legislation; nor was that necessary to give courts of equity in Ohio that jurisdiction.*

2. The English statutes of mortmain were never in force in the English colonies; and if they were ever considered to be so in the State of Ohio, it must have been from that resolution by the Governor and judges in her territorial condition; and if so, they were repealed by the act of 1806.

3. The city of Cincinnati as a corporation is capable of taking in trust devises and bequests for charitable uses, and can take and administer the devises and bequests in the will of C. McMicken.

4. Those devises and bequests are charities, in a legal sense, and are valid in equity, and may be enforced in equity by its jurisdiction in such matters without the intervention of legislation by the State of Ohio.

5. McMicken's direction, in section 32 of his will, that the real estate devised should not be alienated, makes no perpetuity in the sense forbidden by the law, but only a perpetuity allowed by law and equity in the cases of charitable trusts.

6. There is no uncertainty in the devises and bequests as to the beneficiaries of his intention; and his preference of particular persons, as to who should be pupils in the colleges which he meant to found, was a lawful exercise of his rightful power to make the devises and bequests.

7. The disposition which he makes of any surplus after the complete organization of the colleges is a good charitable use for poor white male and female orphans.

8. Legislation of Ohio upon the subject of corporations, by the act of April 9, 1852, does not stand in the way of carrying into effect the devises and bequests of the will.

This cause was argued on both sides with such learning and ability, that we feel it to be only right to the profession to acknowledge the assistance given to us in forming our conclusions; and our only regret is, that it should necessarily have extended this opinion to a greater length than we wished it to be.

We shall direct the affirmance of the decree dismissing the
bill by the court below.