ZURIEL POTTER and others *v.* JONATHAN T. THORNTON.

The act of 9 Geo. 2, Ch. 36, restrictive of gifts of lands, and of money to be laid out in lands, to charitable uses, was never in force in the colony of Rhode Island. It did not extend to the colonies,—was passed after our settlement,—was not agreeable to our constitution,—and was not included in the statutes of England and Great Britain enumerated as in force here, in the colonial act of 1750, found in the Digest of 1767, p. 55. In the second section of that act, which embodies, with a slight alteration, the colonial act of 1760, the words, "Laws of England," do not embrace statutes of Great Britain. The purpose and construction of the above act of 1750 are shown and illustrated by its history.

The jurisdiction of chancery over trusts for charitable uses did not owe its origin to statute, but existed in England prior to the statute of 43d Elizabeth; and is not here confined to the two kinds of charitable trusts, to wit: "for the relief of the poor, and bringing up children to learning," for which a special jurisdiction was first provided by the colonial act of 1721, (Dig. 1730, p. 122; Dig. 1744, p. 87;) but if this were so, the act as amended, and as it now stands in the Digest of 1844, is, like the statute of Elizabeth, retrospective in its character, and extends to charitable gifts *heretofore,* as well as *hereafter,* given, for the relief of the poor, or bringing up of children, "or any other specific purpose,"—and this leaves within the jurisdiction of our court of chancery all gifts to charitable uses which were good at common law.

A gift of lands, made in 1775. "for the building and keeping built and erected, a meeting house for carrying on the public worship of Almighty God, after the modes and ways, rules and establishments, of the sect or denomination of Christians called Baptists, or Antipædo Baptists, to wit: those who hold strictly to the principles of the doctrine of Christ as laid down in the first and second verses of the sixth chapter of Saint Paul's epistle to the Hebrews, and who hold communion with no other; and for the use of the present society in Johnston, or assembling there under the pastoral care of the Reverend Elder Samuel Winsor, and such as may succeed them the said society forever, holding the same principles strictly as aforesaid," is good, in Rhode Island, as a gift to charitable uses, at the common law, notwithstanding the colonial act of 1721, and is within the statute of 43 Elizabeth and the decisions thereunder, and the act in the Digest of 1844, operating retrospectively; nor does the use of the lands given result to the heirs of the donor upon the change of views, and removal from the neighborhood of the society existing at the time of the gift, but under the words,—" and such as may succeed them forever, holding the same principles strictly as aforesaid,"—is a subsisting trust for such a society when it may present itself and ask for a place of worship on the lands,—the legal estate remaining in the grantees and their heirs, to preserve it.

THIS was an action of trespass and ejectment, brought to recover twety-five forty-eight undivided parts of a lot of land in Johnston, claimed by the plaintiffs,—the declaration describing the other twenty-three forty-eight parts of the lot to be in the heirs

of William K. Potter and of Otis Potter, as tenants in common with the plaintiffs.

The case was submitted to the court, by agreement, upon the construction of the deed given by Mary King and her husband, Josiah King, to Elder Samuel Winsor and Deacon John Dyer, in 1775; both parties reserving, in case construction of said deed should be in favor of the plaintiffs, the right to a jury trial upon the question of possession, or as to other facts arising in the cause. It was admitted, however, that, at the time of giving said deed, the said Mary King was seized and possessed, in her own right, of the premises claimed in the suit; that the plaintiffs, if entitled thereto as her heirs at law, are entitled in the proportions set forth in the declaration; that the religious society mentioned in said deed long since changed its views, and ceased to hold the views specified in said deed, and long since ceased to exist as a society in that neighborhood; having, after its change of views, removed to a new house, built elsewhere.

The deed, referred to in the above submission to the court, was as follows :—

"To all people to whom these presents shall come: We, Josiah King, of Johnston, in the county of Providence, in the Colony of Rhode Island and Providence Plantations, Esquire, and Mary, his wife, send greeting: Know ye, we, the said Josiah King and Mary King, for promoting the publick worship of Almighty God, and in consideration of one penny, lawful money, to us paid by Samuel Winsor, of Johnston aforesaid, Clerk or Elder, and Deacon John Dyer, of Cranston, in the county and Colony aforesaid, yeoman, do give, grant, bargain, sell, convey and confirm unto them, the said Samuel Winsor and John Dyer, and to their heirs and assigns forever, a certain small piece of land in said Johnston, butted and bounded as follows :" (here follows a description of the land claimed in the declaration;) "To have and to hold the said granted and bargained premises, with the appurtenances, unto them, the said Samuel Winsor and John Dyer, and to their heirs and assigns forever, upon trust, to and for the uses and purposes hereinafter mentioned, that is to say, for the building and keeping built and erected, a meeting

house for carrying on the public worship of Almighty God, after the modes and ways, rules and establishments, of the sect or denomination of Christians called Baptists, or Antipædo Baptists, to wit, those who hold strictly to the principles of the doctrine of Christ, as laid down in the first and second verses of the sixth chapter of Saint Paul's Epistle to the Hebrews, and who hold communion with no others; and for the use of the present society in said Johnston, or assembling there under the pastoral care of the Reverend Elder Samuel Winsor aforesaid, and such as may succeed them the said society forever, holding the same principles strictly as aforesaid. In witness whereof, we, the said Josiah King and Mary King, have hereunto set our hands and seals, the fifteenth day of April, in the year of our Lord one thousand seven hundred and seventy-five (1775).

(" Signed,)     JOSIAH KING.   [L. S.]

MARY KING.   [L. S.]

" Signed, sealed, and delivered,
    in presence of us.
       ANDREW HARRIS.
       SIMEON READ."

The deed was acknowledged by Josiah and Mary King, June 7th, 1775, and was recorded in Johnston, January 14th, 1779.

*James Tillinghast, for the plaintiffs :—*

The plaintiffs are heirs at law of Mrs. King, the former owner of the estate sued for, and claim to recover on their title as such. The defendant objects to their right of recovery, that Mrs. King and her husband, in 1775, made the deed, of which a copy is filed in the case. The defendant does not claim under the deed. It is agreed, that the society referred to in the deed " long since changed its views and ceased to hold the views specified in the deed, and long since ceased to exist as a society in that neighborhood, having, after its change of views, removed to a new house, built elsewhere." To expedite the cause, the present hearing is had to settle, in the outset, the legal questions arising upon this deed.

I. The grantees under the deed in question, took no beneficial use to themselves. The validity and effect of the deed, there-

fore, depends entirely upon the validity and scope of the trusts declared by it. If these trusts were invalid, or by their own limitation, or from any other cause, have expired, the use remained, or has resulted to the grantor, Mrs. King, or to her heirs, and was, by force of the statute, at once executed in her or them. Adams' Equity, 71.

II. The deed itself is void under 9 George II., Ch. 36, the principles of which were in force in this colony when this deed was made. Dig. of 1767, p. 56. If the record in the town clerk's office could be held a sufficient compliance with the enrollment, required by the statute, it was not made within the prescribed time.

III. At all events, these trusts, if they would have been valid if made under our present statute of charitable uses, were invalid under the colonial act then in force, (Dig. of 1767, pp. 27, 29,) not being within the trusts there enumerated. For, however well settled it now is, that the jurisdiction of chancery over trusts for charitable uses is not derived from statute, yet, where a statute exists, chancery takes jurisdiction only over those trusts that fall within that statute, and all others consequently fail. This has been the uniform construction put upon the statute, (43 Elizabeth,) and there is no reason why the same rule should not be applied to our colonial act. 2 Story's Eq. Jurisp. §§ 1155—1158; *Morice* v. *Bishop of Durham*, 10 Vesey, 521, per Lord Eldon, 541 and seq.

IV. The trusts being invalid when made, the rights of the heirs became vested, and could not be devested by subsequent legislation. Compare *Hillyard* v. *Miller*, 10 Barr, 326, (338) ; *Trustees Baptist Association* v. *Hart's executors*, 4 Wheat. 1, per Marshall, C. J. 28. At least, it is submitted, this is never done against the heir, in favor, as here, of one not claiming under the trusts, but being an entire stranger in the estate. Nor does the language of our present statute, or that of 1844 from which it is copied, require any such construction or effect to be given to it. It is fully satisfied by giving a remedy, in proper cases, in favor of *cestuis que trust*, against *delinquent trustees*.

V. But further, if these trusts were ever valid, they were trusts only for the society then existing in Johnston, and so long only

as it held to particular specified views and doctrines; and that society having ceased to exist, the trusts expired with it, and a use has resulted to the heirs of Mrs. King, the present plaintiffs, upon which they may maintain this action. 2 Story's Equity Jurisp. §§ 1196, 1199, 1200; 4 Kent's Com. 307; 2 Washb. on Real Prop. 116; *North Hempstead* v. *Hempstead,* 2 Wend. 109, per Savage, C. J. 134; *Hopkins* v. *Ward,* 6 Munf. 38; compare *Kirk* v. *King,* 3 Barr. 436. Or, if need be, a reconveyance of the legal estate from the heirs of the trustees will be presumed; *Hillary* v. *Waller,* 12 Vesey, 239, and cases cited in n. C. (Sumner's ed.); *England,* d. *Sybourn* v. *Slade,* 4 Term Rep. 682; *Doe,* d. *Bowerman* v. *Sybourn,* 7 Ib. 2; *Doe,* d. *Burdett* v. *Wrighte,* 2 Barn. & Ald. 710; *Doe,* d. *Putland* v. *Hilder,* 2 Ib. 783; *Doggett* v. *Hart,* 5 Florida, 215; especially as against the defendant, not claiming under the trusts, and who cannot set up this title as against the plaintiffs. A defendant, in ejectment, can only set up title in a third person when it is a present subsisting title, that, if asserted, would prevail against both parties. *Jackson* v. *Hudson,* 3 John. 375, see per Kent, C. J. 386, a parallel case; *Jackson* v. *Harder,* 4 Ib. 202, 211, 212; *Jackson* v. *Todd,* 6 Ib. 257, 265, 266; *Greenleaf's lessee* v. *Birth,* 6 Peters, 302, per Story, J. 312, 313; *Allen* v. *Lyons,* 2 Wash. Cir. Co. 475; *Foster* v. *Joice,* 3 Ib. 498; *Hunter* v. *Cochran,* 3 Barr, 105; *Coal and Iron Co.* v. *Detmold,* 1 Md. 225; *Dickenson* v. *Collins,* 1 Swan, (Tenn.) 516; *McDonald* v. *Schneider,* 27 Mo. (6 Jones,) 405.

VI. The doctrines of *cypres* have never been generally adopted in the United States, and are inapplicable to the circumstances of the country. Hill on Trustees, 79, n. 1, 451, n. 3, and cases cited; Adams on Equity, 70, n. 1; and if ever to be adopted in our State, they have no application to the present case. They are never resorted to except where the intent of the donor is apparent, of giving to *general charity.* Where the donor, as here, has pointed out a particular application, if that fails, chancery never interferes by *cypres* to divert the property to other uses, as against the heirs of the donor. 2 Story's Equity Jurisp. § 1182; *Attorney General* v. *Boultbee,* 2 Vesey, Jr. 381, 388; *Attorney General* v. *Whitchurch,* 3 Ib. 141.

*Hart, for the defendant :—*

The deed conveys to Winsor and Dyer an absolute estate in fee simple, in trust, for certain defined purposes. There are no words in the deed which can be said, in any way, to raise a condition or limitation. A condition brings the estate back to the grantor or his heirs; a limitation carries it over to a stranger. Of course, it is not pretended that there are any words in the deed carrying the estate over to a stranger, in any event. If the plaintiffs have title, it must be on the grounds that the deed vested in Winsor and Dyer an estate upon condition subsequent, which has been defeated by breach, reverting to the grantors and their heirs. As to what words amount to a condition or a limitation, see 4 Kent's Com. 143, (9th ed.); 1 Washburn on Real Property, 445–459; *Proprietors Church in Brattle Square* v. *Grant*, 3 Gray, 147–8. The words, says Lord Coke, usually employed in creating a condition are,—" upon condition,"—and this is the most appropriate; or the words may be,—" so that," " provided," " if it shall happen." Coke Litt. 203, a, b; 2 Greenleaf's Cruise, p. 3. Thus, a grant was made to a religious society, " *upon condition* " that it should be held for the support of a minister preaching in a certain church, standing upon a certain lot of land. The proprietors took down the church and erected it upon another lot. This was held to work a forfeiture, by the condition subsequent being broken. *Austin* v. *Cambridgeport Parish*, 21 Pick. 215. So, where the grant was " *upon condition*," that the public buildings of a county be fixed on a part of it, and they were fixed upon another lot. *Police Jury* v. *Reeves*, 18 Martin, 221. So, a devise of land for the purpose of building a school house, "*provided*," it is built within such a distance of such an object, was held a condition subsequent. *Hayden* v. *Stoughton*, 5 Pick. 528. These are all clear and express conditions. But conditions subsequent, especially when relied upon to work a forfeiture, must be created by express terms or clear implication, and are construed by courts with great strictness. *Bradstreet* v. *Clark*, 21 Pick. 389; *Ludlow* v. *New York and Harlaem Railroad*, 12 Barb. 440; *Merrifield* v. *Cobleigh*, 4 Cush. 178. The *habendum* in an indenture of lease was as follows :—" To have and to hold the said piece of land above

mentioned to the said William Smith, his heirs and assigns forever, *erecting* and keeping in repair a certain shed which he, the said W. S., is to erect and build on said ground, for the use of said mill, 20 feet by 12." This was followed by a covenant to build and keep the shed in repair for the use of the mill. The shed was built, but it was afterwards closed up and put to other uses than those mentioned in the lease. The action was ejectment, brought by the heirs of the lessor against those of the lessee. It was held, that the words,—" erecting, building and keeping in repair," &c.,—did not create a condition; and that the grantor's remedy was on the covenant. *Jackson* v. *McClellan*, 8 Cowen, 295. Conditions subsequent are not favored in law. 4 Kent's Com. 146, (9th ed.) ; *Ludlow* v. *New York and Harlaem Railroad*, 12 Barb. 444.

By this deed a charity is created that cannot be diverted by non-user. The trustees, like all trustees for charitable uses, will be subject to the supervision of the court of equity. *Wright* v. *Linn*, 9 Barr, 433. Nor will the trust be allowed to fail for want of a trustee, or for any other cause, unless it be inconsistent with law or public policy. 4 Kent's Com. 349, n. (9th ed.); 2 Story's Eq. Jurisp. p. 390, § 1059. If the particular mode by subsequent circumstances become impossible, the general object is not to be defeated, if it can, in any other way, be obtained. Where there are no objects remaining to take the benefits of a charitable corporation, the court will dispose of its revenues by a new scheme, upon the principle of the original charter, *cypres.* 2 Story's Eq. Jurisp. §§ 1176, 1177.

BRAYTON, J. The conveyance of this estate is made to the grantees, Samuel Winsor and John Dyer, expressly in trust, and for a definite purpose, viz. : " for the purpose of erecting and maintaining thereon a meeting house, for carrying on the public worship of God, after the modes, ways, rules, and establishments of a certain sect of Christians, holding a certain faith, stated in the deed ; and for the use of (as expressed in the deed) the present society assembling there under the Rev. Samuel Winsor, (one of the grantees,) and for the use of any other society which may succeed them, forever, holding the same principles. The deed clearly states the objects, and the property. The way in

which the property is to go is clearly pointed out. Where these all exist, it is said, a trust is created. If valid, a court of equity will execute it. But against the validity of this trust, it is objected, that it is against the provisions of the act of 9 George II., Ch. 36, which declares, that no land shall be given for, or charged with, any charitable use, unless by deed executed twelve months, at least, before the death of the grantor, enrolled in chancery within six months after its execution, and containing no revocation clause, or agreement for the benefit of the grantor, or any other person. It is claimed, that this statute was in force here, in 1775, when this deed was executed; and this is claimed, upon the language of the second section of an act contained in the Digest of 1767, that in all actions, &c., where there is no particular law of the colony, or act of Parliament introduced for the decision or determination of the same, there, and in such case, the laws of England shall be put in force for the decision and determination of the same. In the year 1700, an act was passed upon this subject, embodying substantially the provisions of this section, except that it omitted the words,—" or act of Parliament introduced,"—and declaring only, that when there was no particular law of the colony to determine a case, " the laws of England should be put in force " for that purpose. This act was passed before the formal introduction of any English statutes, and remained unaltered until after the colonial legislature formally declared, in 1750, certain enumerated statutes of England and Great Britain to be in force here. The act of 1700 was never understood as having introduced any English statute. This is quite evident from the provisions of the first section of the act of 1750. It provides, that all the courts of the colony shall be held and governed by the statutes, laws, and ordinances of this colony, and such statutes of Parliament as are hereinafter mentioned, that is to say,—enumerating them; " all and every of which " are declared to be " in full force." This enumeration included many acts of Parliament of England,—many of the statutes enacted after the union with Scotland, and one statute passed in the reign of George II.; but did not include the act of 9 George II., Ch. 36. Had the legislature supposed that the statutes of Great Britain, generally, had been put in force here by the act of 1700, which is

the second section of this act, the enumeration in the first section would have been entirely unnecessary, and out of place.

There was no reason for the introduction here of this particular act of 9 Geo. II.  It was not one of those statutes which could be held to extend to the colonies by its own force, which colonists may be presumed to carry with them to their new settlements.  It was made after the planting of this colony, some hundred years.  No act, says Lord Mansfield, made after a colony is planted, can be construed to extend to it, without express words, showing the intention of the legislature that it should.  *Rex* v. *Vaughan*, 4 Burr, 2500.  But it is not an act which was intended to apply to the colonies, whether planted before or after its enactment.  Its policy is wholly English, as shown by its recitals, and both by what it forbids, and by what it permits.  It begins by referring to the ancient laws against alienations in mortmain, originating in causes which never existed in the colonies.  It recites, that the public mischief had lately greatly increased, meaning in England only; for there is no evidence that in the colonies devises to charitable uses had ever prevailed to an inconvenient extent, or in the 9th year of George II., had alarmingly, or to any extent, increased.  It is wholly English in its exemptions, permitting such devises to the two English universities and to three great English schools; and finally, with respect to alienations *inter vivos*, which it regulated, it requires for their validity, that they should be enrolled in His Majesty's High Court of Chancery. *Attorney General* v. *Stewart*, 2 Mer. 143 ; *Penn et al.* v. *Carey et al.* 24 How. 499, 500.  Considering the policy of this act, and that it had no application to us, it was not likely that it would be introduced.

The statutes were introduced, not in 1767, but in 1750.  The memorial, which furnished the occasion upon which they were declared to be in force here, shows, that the act of 1700 had never been regarded as introducing acts of Parliament generally.  That memorial was from the leading members of the bar of that day, of which the attorney general was one.  It stated that the superior court of the colony had lately decided, that the statute laws of Great Britain were not in force, except such as were introduced by some law of the colony,

though the courts, in all times before, had admitted such of them as related to the common law to be in force, and had adjudged upon them as such. The memorialists assume, that notwithstanding the act of 1700, there had been, down to that time, no colonial act introducing any statutes as such; but that there had been no occasion for any such act, while those statutes which related to the common law were adjudged to be in force. The colonists brought with them the common law of England, as it existed at the time of their colonization, and as it had, down to that time, been modified by any statute of Parliament. It was their birthright, in so far as that law was applicable to their circumstances here, and so far, was it presumed to be in force here ; and for the same reason were those ancient English statutes presumed to be in force. But the matter of complaint was, that even those which related to, and had become part of the common law of England, had been declared not to be the law of the colony; and the memorialists ask the General Assembly to restore that class of acts of Parliament, now excluded by the late judgment of the courts.

This memorial was presented at the October session, 1749. The action of the General Assembly upon it shows, also, as the memorial itself shows, that neither did the act of 1700, nor, did any other affect to introduce any statute which was not understood to be part of the laws of England, which were the birthright of the colonists. The General Assembly assume the decision of the court to have been, that the statutes of that part of Great Britain, formerly called England, were not in force, though such of the said statutes as related to the common law had always theretofore been admitted by all the courts to have been in force ; so that there was no occasion for any act for their formal introduction. They accept the reason of the memorialists why there was no such act. In order to remedy the evil complained of, the memorialists were appointed a committee to prepare a bill for introducing "such of the statutes of England as are agreeable to the constitution." This would restore what the memorialists called "the exiled statutes," and which they represent, and the Assembly assume, as of absolute necessity to law proceedings. The committee are directed to do more than merely

`Potter and others v. Thornton.`

to restore such statutes, and formally to introduce all such as might be agreeable to the constitution, whether they were enacted by Parliament before, or after, the settlement here. We may infer from the act reported by the committee, containing, as it does, acts of Parliament enacted after the union, as well as before, and from the adoption of that report, that the design was to declare and settle, what statutes of Great Britain should thenceforth be in force in this colony. It was not intended, however, to introduce any act which was not agreeable to the constitution; and for this reason, doubtless, it was, that though another statute passed in the reign of George II., was among the statutes introduced, the act of 9 George II., Ch. 36, was not inserted.*

---

* The memorial referred to in the above opinion, and the resolution of the General Assembly, raising the committee to prepare the act enumerating the English statutes, and statutes of Great Britain, in force in the colony, were as follows:—

" *The Humble Remonstrance and Memorial of the Subscribers showeth* :—

" That, whereas, the Honorable the Judges of the Superior Court of this Colony did, by their late judgments, determine that the statute laws of Great Britain were not in force in this government, except such as are introduced by some law of this Colony; and that, whereas, in all time heretofore, the courts of this Colony, both inferior and superior, have admitted such of the statutes of England as relate to the common law to be in force here, and have adjudged upon them as such, so that the government made no formal introduction of the Statutes of England: but they now being banished out of this Colony, and adjudged to be no part of our law, our laws are altogether imperfect, and scarcely any one law proceeding can be commenced or brought to issue.

" Wherefore, your memorialists humbly pray, that your Honors would be pleased to relieve this government in their present unhappy circumstances, either by calling home these exiled statutes, or making some others more advantageous to this government, and your memorialists, as in duty bound, shall ever pray.

J. Aplin.
D. Updike.
J. Honeyman, Jr.
M. Robinson."

" *Whereas*, Messrs. Daniel Updike, James Honeyman, Jr., Mathew Robinson, and John Aplin, attorneys at law, by a memorial under their hands, have represented unto this Assembly, that the judges of the Superior Court of judicature, &c., in this Colony, have, of late, judicially determined that the statutes of that part of Great Britain called England, are not in force in this government, except such as are introduced by some law of the Colony; and this notwithstanding that, in all time heretofore, the courts throughout the Colony, both superior and inferior, have admitted such of the said statutes as relate to the common law, to be in force

Potter and others *v.* Thornton.

It is objected, also, against the validity of this trust, that, inasmuch as we had a statute in relation to certain charitable uses, viz., " for the relief of the poor, and bringing up children to learning," a court of chancery cannot take jurisdiction over any others. It is conceded, however, that chancery jurisdiction over charities is not conferred, either here or in England, by statute, but existed prior to any statute upon this subject. It is true, that in England, as the counsel say, the court of chancery, though it assumed jurisdiction over charitable uses generally, prior to the statute of 43d Elizabeth, will not enforce or aid any trust for any indefinite purpose, not charitable within that statute; that is, which is not for some one of the purposes enumerated in it, or not coming within the purview and spirit of those enumerated. The reason for thus limiting the jurisdiction does not very clearly appear from the reported cases. It is better accounted for by the theory suggested by Mr. Justice McLean, in *Wheeler* v. *Smith*, 9 How. 55, where he says, " it rests upon the assumption that the enumeration included all the charities which existed at common law." It is difficult to understand, since the statute is not prohibitory, how it should restrain a jurisdiction, otherwise existing, merely because it provided a new mode of reaching the trusts enumerated. However that may be, all the charities enumerated, and perhaps more, did exist at common law. This may be safely assumed, and that they all existed here. Our act of 1721 enumerates two only. It does not prohibit others. It provides a jurisdiction to inquire into the abuses of these, and it is quite too much to assume, that it designed to enumerate all those existing at law,—the common law of England. It might, with some reason, be presumed, from the long enumeration in the statute of Elizabeth, that it was intended to embrace in its pro-

here, and have adjudged upon them as such, so that there has been no occasion of an act of the Assembly for the formal introduction of those statutes; but as the case now stands, the laws of this Colony are altogether imperfect and rarely any law proceeding can be commenced or brought to issue;—

" And now this Assembly, having taken the premises into consideration, do vote and resolve, and it is hereby voted and resolved, that the memorialists be, and they are, hereby constituted a committee to prepare a bill for introducing into this Colony such of the statutes of England as are agreeable to the constitution, and present the same to this Assembly at the next session."

visions every use deemed charitable at law; but that reason must entirely fail in relation to our act.

If we may take the adjudications upon the statute of Elizabeth as applicable to ours, " considering the nature and constitution of the place and people here," and there is no reason why we should not, there is one bearing upon the matter before us, and upon a point in regard to which the statutes are identical. As our statute now stands amended in the Digest of 1844, it is, like that of Elizabeth, expressly retrospective. That of Elizabeth provides, that commissioners shall be awarded for breaches of trust, in respect to gifts " *heretofore* given," &c., or which shall be hereafter given; ours gives jurisdiction over such as " *have been or shall be* given," &c., to and for the relief of the poor, or bringing up children to learning, or any other specific purpose. Under the English statute, trusts created long before its enactment, but which were invalid, have been held good under it. *Smith* v. *Stowel,* 1 Ch. Cas. 159 ; Flood's case and Collison's case, Hob. R. 136 ; 2 Story's Eq. Jurisp. § 1172 ; Rivet's case, Moore, 890 ; *Attorney General* v. *Combe,* 2 Ch. Cas. 18. If this trust, then, was not valid under the act of 1721, the statute, as it now is, looking back to all gifts and assignments theretofore made for the charities specified, or for any other specific purpose, would enable a court of equity to enforce this specific trust, though created before the amendment by which it was included. This, however, is a trust which would be enforced in England under the statute of Elizabeth. It is one of those enumerated,—for supporting churches. It is good under that statute. It would have been valid before that statute, and we see no reason why it should not have been valid before the act of 1721 ; but if not, it is now, by the retrospective operation of the amended act.

It appears from the statement of facts in the case, that the society stated in the deed as assembling then under the Rev. Samuel Winsor, has long since ceased to hold the views specified in the deed,—have long ago removed from that neighborhood, and now occupy a house, built by themselves, at another place. It is objected against this trust, that it was one for the benefit of that society only,—the one then existing,—and for so long a time only as it should hold the views specified ; and that, upon

changing those views, the trust expired, and a use has resulted to the heirs at law of the grantor, she having deceased. In our view of the language of this trust, it was to extend the benefit of the gift, not merely to the society then existing, but if that ceased to exist, or ceased to be of the faith specified, then to any other society, holding the same faith, which might succeed them. The language is, to the use of the present society, &c., "and such as may succeed them, forever, holding the same principles." We see no reason why, if such other society should now present themselves, and ask for a place of public worship on this estate, how the trustees could refuse its use for that purpose; and if not, then we must hold this to be a subsisting trust,—the legal estate remaining in the grantees or their heirs to preserve it. The resulting trust to the grantor or her heirs, to be executed by the statute, could not arise; and we have no occasion to consider, whether a conveyance has been made by the trustees against their duty, and in breach of their trust, to such heirs.