\*CITY OF CINCINNATI FOR, ETC., v. ANDREW McMICKEN ET AL.

1. A DEVISE TO A CITY FOR A COLLEGE TO BE ERECTED ON A CERTAIN TRACT DOES NOT RESTRICT IT TO THAT SPOT, IF IT BECOMES UNSUITABLE.

A devise to a city for a college of the highest grade to be erected on a certain tract will not be construed to restrict the location of the building perpetually to one spot. That if the site selected by the testator was at that time a proper one, but should for any reason thereafter become unsuitable, the trustees under the will would be authorized to erect buildings and conduct the institution on other suitable grounds.

2. CITY WAS CAPABLE OF TAKING AS DEVISEE, AND COURT OF EQUITY WILL ENFORCE THE PROVISIONS OF THE GIFT.

Such a devise is not a private one, but in its nature a gift to a general public use; the city was capable of taking under the will as devisee, and a court of equity will enforce its provisions, or so mould them to suit changed circumstances, as will best carry out the real intentions of the testator and make the devises most conducive to the welfare of the beneficiaries.

3. TRUSTEES MAY REMOVE BUILDINGS TO MORE SUITABLE SITE WITHOUT FORFEITING ESTATE.

Should the trustees remove the university to another and more suitable site, they would be authorized under the will, to lease the present site and treat it generally as the other real estate devised for the purpose of the university; and this, without forfeiting any part of said estate, or causing it to revert to the heirs of the testator.

4. ACTS OF TRUSTEES CANNOT CREATE FORFEITURE.

Acts or omissions of the trustees cannot create a forfeiture and the reversion of the property to the donor's heirs. The court would only remove the trustees and appoint others, or compel due performance.

5. CITY MAY SET APART PUBLIC GROUND FOR A COLLEGE, THOUGH PAID FOR BY TAXES AND BIBLE IS USED AS A BOOK OF INSTRUCTION.

The city of Cincinnati has the authority under the act of April 16, 1870, 67 Ohio Laws, page 86, to set apart and appropriate for said university, any public ground of the city, not specially appropriated, or dedicated by ordinance for any other purpose, notwithstanding said property was paid for by a tax levied on the general duplicate of all the property of the city, nor would this power be limited by the fact that the testator had provided that "the Holy Bible, King James' version, should be used as a book of instruction in the university."

6. POWERS OF TRUSTEES MAY BE DEFINED IN ACTION TO OBTAIN DIRECTOR AS TO AMBIGUOUS WILL.

An action under section 6202 of the Revised Statutes to obtain the opinion and direction of the court as to an ambiguous will, but applies when altered circumstances render the carrying out of a trust in literal terms of the donor undesirable, and the trustees desire to know their powers.

7. IN SUCH SUIT COURT CANNOT INQUIRE WHETHER TRUSTEES HAVE DONE OR OMITTED ACTS OF FORFEITURE.

Upon such an application any question as to whether the trustees have committed acts, or omitted to perform any duty which is alleged as a ground of forfeiture of the estate to the heirs of the donor, constitutes no defense and cannot be inquired into. The property has been devised for public charitable purposes, and a court of equity will

---

\*This judgment, "when modified as agreed by counsel," was affirmed by the supreme court, March 7, 1893.

see that the trustees perform their duty under the will, or remove them and appoint others who will, and in no event can the heirs of McMicken assert any title or ownership inconsistent with the use to which the property has been devised.

Appeal from the Court of Common Pleas of Hamilton county.

COX, J.

The plaintiffs pray the advice and direction of the court as to whether they may remove the university of Cincinnati from its present site on the homestead of Charles McMicken, on McMicken avenue, to a site of forty-three acres offered to be donated to them for that purpose by the city of Cincinnati, on the south end of Burnet Woods, about one-half mile north of the present location, and in said city.

They claim that by reason of noises from an inclined plane and smoke from numerous factories and breweries, manufactories and other causes, the present site has become entirely unsuitable for the purposes of an university, such as was contemplated in the will of Charles McMicken, who devised lands and personal property for that purpose. The heirs of McMicken file answers denying the right of the directors to remove the institution from that site, and claim that it was the homestead for many years of Mr. McMicken; that he was thoroughly acquainted with its character and surroundings, and directed the buildings to be erected there, and that the site is no more unsuitable now, than at the time of making the will in 1855, or at his death in 1858, and that the plaintiffs have no authority to change the location, nor can the court order it to be done.

Numerous other defenses are set up, charging violations of the trust confided to plaintiffs by the will, and claiming that plaintiffs are not entitled to the relief sought, but that the devises for a university under said will, have failed by reason of the violation of the trusts confided to plaintiffs, and that all said property has reverted to the heirs of Charles McMicken.

We have confined the testimony in the case to the object sought to be secured by the petition of plaintiffs, to-wit:

*First*—Is the present site of the university a suitable one for such an institution as McMicken contemplated in his will, and are the directors confined to that locality for all time, for the erection of college buildings?

*Second*—If not, has the court the authority to empower them to remove it to another site?

*Third*—Is the site of the forty-three acres offered on the south side of Burnet Woods a suitable one?

*Fourth*—If the present site be abandoned for the college building, will it be forfeited to the heirs of Mr. McMicken?

*Fifth*—If not forfeited to the heirs, may the directors erect such building thereon and lease them, or the ground, on the same terms as authorized by the will for other grounds and buildings?

The principle on which we have excluded evidence as to the claim of the heirs is, that as the property had been dedicated for a particular purpose, if the city appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery to compel a specific execution of the trust, by restraining the corporation from such misappropriation; but even in such a case the property dedicated would not revert to the original owners. Its use would still remain in the city limited only by the conditions imposed in the grant. 6 Peters (U. S.), 507; 1 Story Equity, 291.

When lands are dedicated by the owner to any lawful use, public, private or charitable, and are used for the object and in the manner contemplated by the owner, it inures as a grant. If accepted and used in that manner, it works as an *estoppel in pais*, precluding the donor from asserting any ownership inconsistent with such use. Brown v. Manning, 6 O., 298. And on the authority cited above, if not used, a court of chancery will compel a specific execution of the trust.

To solve the question as to the suitableness of this site, at present, for a university, we must ascertain from the will of Mr. McMicken, the kind of an institution he had in mind when the devise was made.

The 31st section of his will announces his views in these words:

"Having long cherished the desire to found an institution where white boys and girls might be taught, not only a knowledge of their duties to their creator and their fellow men, but also to receive the benefit of a sound, thorough and practical English education, and such as might fit them for the active duties of life, as well as instruction in the higher branches of knowledge (except denominational theology), to the extent that now or may hereafter be taught in any of the secular colleges or universities of the highest grade in the country, I feel grateful to God that through His kind providence I have been sufficiently favored to gratify the wish of my heart. I, therefore, give, devise and bequeath to the city of Cincinnati and to its successors, for the purpose of building, establishing and maintaining, as soon as practicable after my decease, two colleges for the education of white boys and girls, all the following real and personal estate in trust forever, to-wit," etc. (describing the property devised).

By subdivision 2 of sec. 32 of the will, Mr. McMicken provides that:

"The college buildings shall be erected out of the rents and income of my real and personal estate, and on the premises on which I now reside in the city of Cincinnati, by me purchased from the administrators of Luman Watson, deceased, and which shall be plain, but neat and substantial in their character, and so constructed that in conformity with their architectural designs they, from time to time, may be enlarged as the rents of the estate devised will allow, and the ends of the institute may require.

"The said buildings shall be erected on different parts of said grounds, to-wit: that for the boys on the north, and that for the girls on the south of the road lately cut through the said grounds. And I direct that the plot of ground on which the college for the boys shall be built, shall comprise not less than from five to six acres, and that on which the college for the girls shall be built, shall comprise all below the said road, which plot may, I suppose, contain about three acres. Should additional ground be required for the buildings connected with the college for the girls. I would refer to lot No. 22 in the sub-division made by Jacob Maderia, adjoining the last described premises on the west."

Witnesses of learning and experience have testified as to what would be a suitable position for such a university. It should be quiet, of good access, with plenty of light, free from noises, cheery, attractive to the eye, etc. Testimony has been offered to prove that the site selected for the university had been for years the homestead of Mr. McMicken; that he was a man of intelligence, had been a school teacher in his early days, and was well qualified to, and did decide, that this was a suitable site; and that the surroundings do not differ now materially from what they were when he executed his will or when he died; that McMicken avenue, instead of being a rough country road as it was then, is paved with granite, and the property can be approached by lines of electric and cable roads, and that the greatest annoyance arises from an inclined plane authorized to be erected by the city; that some churches have been erected in the vicinity, which tend to improve the moral character of the neighborhood. It is true there has been an abandonment of some manufactories and breweries which existed years ago, but the breweries in the immediate vicinity have grown to mammoth proportions, and the vast amount of coal smoke of a sulphurous character, which constantly pours out of the chimneys, is not only a constant source of annoyance to the senses, but from all the testimony tends to destroy rapidly the finer instruments which are now used in the chemical and physical departments. The constant jarring of the earth by the ascending and descending of the cars on the inclined plane in the immediate proximity of the college site, also affects the operation of experiments in those departments. While this site was selected by Mr. McMicken as then suitable in his estimation for the college, yet by the very terms of the will he gave power to the trustees to remove it to other parts of his ground, and even to purchase ground from other persons for that purpose.

His great object was to found a college of the highest character, but not to restrict the location of the buildings forever to any one spot. It would be difficult to frame a description of an institution of a higher character than that which he described. It was to be an institution in which the students to be admitted

"should be taught not only their duties to their creator and their fellow-men, but also to receive the benefit of a sound, thorough and practical education, and such as might fit them for the active duties of life, as well as instructed in the higher branches of knowledge (except denominational theology), to the extent that now is or may hereafter be taught in any of the secular colleges or universities of the highest grade in the country."

I emphasize this last sentence because it shows the intention of the testator, not to keep the institution in the old ruts of education, but that in all that should be taught, as well as in the mode and instruments of teaching, it should be a progressive institution, keeping pace with the onward march of education and science, teaching the "higher branches of knowledge" to the extent that they were taught when his will first spoke, and such as might thereafter be taught, or used in any of the secular colleges or universities of the highest grade in the country."

With this elevated idea it would naturally attract large numbers of pupils, if the location, buildings and surroundings were such as to facilitate the manner of education and make it agreeable and comfortable to the pupils. But the object of the testator could not be accomplished if the buildings were inadequate, or the location unsightly, or with such influences surrounding it as would drive students from its portals to other high scientific institutions which presented more attractive surroundings. The object of the testator in providing for an institute of such high character must be the paramount idea in the minds of the court, when called upon to give directions to the trustees, as well as in those of the trustees when they attempt to carry out the trust. "What will most effectually tend to carry out his views?" must be the guiding question.

That the site is an unsuitable one for such a purpose, the testimony, as well as our own inspection most emphatically establishes. Much of the ground is on a steep hillside, and a suitable foundation can only be obtained at great expense, and the wonder is, that the trustees expended $76,000 in erecting the buildings they have on the site, when from the poor foundation it required nearly half of that amount to be put underground. It can only be explained upon the idea, that in their desire to carry out the provisions of Mr. McMicken's will to the letter they subordinated the object of the testator to the place where it should be carried out, and suffered that to be the true test.

*Second*—Has the court the power to authorize the trustees to remove the university to another site in the city half a mile from its present location?

The action of the trustees is brought under sec. 6202 Rev. Stat., which provides that

"Any executor, administrator, guardian, or other trustee may maintain a civil action in the court of common pleas against the creditors, legatees, distributees, or other parties, asking the direction or judgment of the court in any matter respecting the trust, estate, or property to be administered, and the rights of the parties in interest, in the same manner, and as fully as was formerly entertained in the courts of chancery," etc.

It is claimed by defendants that this is an action for the construction of a will, and that such action can be maintained only where there is an ambiguity of expression or uncertainty, as to the intention of the testator in regard to the disposition of his property, and that neither of these is true, as regards the will of Charles McMicken.

But this is not a proper idea of the intention of this action or of the statute under which it is brought. The statute contemplated that there may be questions arising either in the will itself, or from circumstances growing out of it, or out of a condition of affairs proper to be provided for by it, or doubts of the trustees as to their duty in any respect, upon which, before taking action under the trust, they desire the judgment or direction of the court, and having such a desire they may ask the direction of the court. Wiswell v. Church, 14 O. S. 31; Merrick v. Merrick, 37 O. S. 129.

Now, it is not claimed in the petition that that portion of the will upon which the trustees ask the direction and judgment of the court is ambiguous or uncertain, but that by the changed condition of affairs in and around the locality fixed upon by the testator for the university, it has become difficult, if not impossible, to carry out the clear and manifest intention expressed in the will, to establish and carry on a university of the highest grade, and that within a short distance of this place and in the same city, there is an appropriate site, meeting all the requisites for such a university, which can be obtained, and is offered to them, and asking the court whether they have the authority to change the location of the university and accept such a site.

May the court give such directions as will enable them to do this? Devises for institutions of learning are treated in law as charitable trusts, and entitled to the most liberal interpretation. Our supreme court in the case of McIntyre v. Zanesville Canal Co., 9 O. 287, say:

"Whether the bequest can be carried into exact effect or not, a court of equity will sustain the legacy and give effect to it in some form upon principles of its own. * * * One of the earliest elements of any social community upon its lawgivers at the dawn of its civilization, is adequate protection to its property, and institutions which subserve public uses or devoted to its elevation."

And this is quoted with approbation by the supreme court of the United States Perin v. Executors and Heirs of McMicken, 24 How. Adopting the language of the supreme court in McIntyre v. Zanesville Canal Co., 17 O. S. 363:

"We must look deeper than the mere words of this donation, and through them see its spirit. We must inquire what the donor himself would now direct had he lived to witness the present altered circumstances of the case."

Without going at length into the learned and elaborate argument and citation of authorities of counsel on both sides, it seems to us that the adjudications in our own state, and especially that in McIntyre v. Zanesville Canal Co., 9 O. and 17 O. S. are conclusive as to the authority of the court, to give such directions to the trustees as will give effect to the intention of the testator. The university, not its place, is paramount in his thoughts. He does not make the donation dependent on the site, nor that the site shall always remain the same.

Suitable buildings erected at a convenient point in the city, so adapted as to enable those entrusted with that duty to give instruction in those things which he describes in his will, most certainly will conduce more to carry out his intentions, than if placed on a site which makes that instruction difficult, if not impossible.

The powers of a court of chancery in regard to a devise of this kind, as well as the broad principles upon which the supreme court of the state act, may not only be illustrated by the case of McIntyre, Adm'r v. Zanesville Canal & Mfg. Co., 17 O. S. 352, but that case is one whose principles we may well follow in this.

A resume of the facts and points therein decided are instructive here:

McIntyre, the original proprietor of the town of Zanesville, by his last will and testament, executed in March, 1815, directed, that in certain contingencies the greater part of his estate should be invested in the stock of the Zanesville Canal & Mfg. Co., and that the profits, rents and issues of the stock, as well as all his estate of whatever kind, be used to support a poor school, which the trustees should establish in the town of Zanesville for the use of the poor children in said town. He died in August, 1815, and three contingencies occurred subsequent to his death, which induced the trustees to call on the court for advice and instruction as to their duty.

First—The stock of the Zanesville Canal & Mfg. Co. could not be obtained, and 'f obtained it was valueless.

The court instructed the trustees that if the investment in the stock specified h-s become impracticable, or valueless, to invest the fund in other safe and productive forms.

Second—The town of Zanesville after testator's death grew into a city, and its corporate limits were extended so as to embrace a greater extent of territory and more poor children of such added territory.

The court decided, and directed, that the benefit of the devise is not limited to the children of the town as it existed at the date of the will, or to the corporate limits of the

town or city, but extends to the poor children residing in additions made, or to be made thereto, according to the popular sense of the word, at the time of dispensing the charity."

Third—After the death of the testator, the state of Ohio had inaugurated a system of free schools supported by general taxation, to which all, rich and poor, are alike entitled to resort for a free education, and this has rendered the name of a poor school odious, while there are many children in the city of poor parents who do not avail themselves of the free education on account of the want of books, proper clothing, or other causes. We have a surplus fund on hand—how shall we distribute it?

The supreme court say, the "ultimate object of the bequest was the education of poor children in Zanesville;" the establishment and maintenance of a "school" or "institution" being a mere means to that end; and when a change of circumstances has rendered other means indispensable to the accomplishment of that end, the trustees may resort to such other means in connection with said school or institute and as incidental thereto, including among such other means, that of so far relieving the necessities of poor children as to make their education practicable, in cases where that result cannot otherwise be obtained, and where the proceeds of the fund are sufficient for that purpose."

Among the "means for relieving the necessities of poor children" so as to make their education practicable, the judge delivering the opinion, which was concurred in by his associates, says: "The object was to instruct poor children in spite of their poverty. This can be done by other means than merely remitting tuition fees; it can be done by furnishing books, shoes, clothes, and in rare cases, food." Another use to which the fund can be doubtless legitimately applied, is the furnishing poor children an education in the higher branches of learning, such as are not taught in the common or public schools. In reference to the changed condition of affairs since the death of the testator, the court say, because the state has established school for all children, is the object of the charity exhausted, and must the fund be paid over to the heirs of the donor? We think not. We must look deeper than the mere words of this donation, and through them see its spirit. We must inquire what the donor himself would now direct, had he lived to witness the present altered circumstances of the case."

Concurring in these enlarged views of the supreme court, we have no hesitation in giving our judgment and direction, that the trustees are authorized to remove the college or university to a more suitable site than that which it at present occupies.

*Third*—Is the tract of forty-three acres in Burnet Woods a suitable site for a university?

The testimony satisfies us that it is convenient, and highly attractive, for the purposes of a university, and if suitable buildings be erected thereon, the change will largely increase possibilities of the institution in reaching that high standard which McMicken marked out for it. It is contended, however, that the city has no authority to donate the lands of Burnet Woods for this purpose, that inasmuch as those lands were purchased and paid for by taxation on the property of all citizens, white and colored, that it can not be devoted to an institution provided for the education of white persons alone, and the heirs of McMicken in preference to others, and in which the Bible is required to be taught as a text book.

We think it is not absolutely necessary to decide that question in this case, but as it may have an important bearing on the subsequent action of the directors in attempting to use the grounds for the university, and is really a very grave question to be considered, we feel it our duty to express an opinion on it. If the ground in Burnet Woods can not be obtained on legal terms, it would, in our opinion, not preclude the directors from obtaining another suitable site. But as this seems to be, in the opinion of all the witnesses, the best, can the city enter into any proper arrangement with the directors for that purpose?

We understand from the testimony that the city has the absolute title to this ground, and no limitations on its use are imposed, either in the deed of conveyance, or by law. By subdivision 34, of sec. 1692, Rev. Stat., all municipal corporations have the right to acquire by purchase, or otherwise, and hold real estate, or any interest therein, and other property for the use of the corporation, and to sell and lease the same. This right to purchase, hold, lease and sell is vested in the city authorities, to be used at their discretion for the corporation; a discretion which courts can not control, except in case of fraud or abuse of corporate authority.

We are not left to decide this question on mere theory or general principles of law or equity. What shall be the text books in our public schools, and who shall prescribe their name and character, has been settled by the supreme court, and how and by whom property of a corporation, and taxes on the whole property can be used to supplement devises and donations for colleges, has been specifically prescribed by the legislature. The supreme court in Board of Education v. Minor, 23 O. S. 211, held that:

"The constitution of the state does not enjoin or require religious instruction or the reading of religious books in the public schools of the state; and the legislature have placed the management of the public schools under the exclusive control of directors, trustees and boards of education, the courts have no rightful authority to interfere by directing what instruction shall be given or what books shall be read therein."

The university to be established under the will is not a private one, but in its nature public. The supreme court of the United States in Perin v. Cary, 24 How. 465, on February 25, 1861, decided that a charity of this kind is a gift to a general public use, which extends to the rich as well as the poor; that the city was capable of taking under the will, and the devises and bequests were charities in a legal sense, valid in equity, and could be enforced by a court of equity without the intervention of the state legislature of Ohio; that Ohio, in her legislation, has made municipal corporations trustees for charitable devises and bequests, and that the management of this is a duty, and the privilege to take this, is one given and enforced by law.

The city of Cincinnati accepted the trust, and the legislature of the state, desirous of carrying out the cherished idea and duty of encouraging education, in this very university, with others, did by act of April 16, 1870, 67 O. L. 86, authorize the city of Cincinnati to accept any property and funds heretofore or hereafter given to the city, for the purpose of founding, maintaining or aiding a university, or college or other institution for the promotion of free education, and upon such terms, conditions and trusts, not inconsistent with the law as the common council may decree expedient and proper for that end."

And the act provided fully for the government of the institution by placing the care, custody and management, and the entire administration of the trust, in the hands of directors, who were to appoint agents for the care of the trust property, to collect the income and rents; the directors to appoint a president, professors, tutors, etc., provide necessary buildings, books, apparatus and means and appliances, and, in short, to do everything necessary to carry out the full intent of the devisors or donors. And it is also provided that "the common council of the city may set apart or appropriate as a site for the buildings and grounds of the university, college, or institution so founded, any public grounds of the city not specially appropriated or dedicated by ordinance to any other use or purpose, any law to the contrary notwithstanding, and the board of education of said city may also, for a like purpose, set apart, convey or lease for a term of years, any grounds owned by said board."

The board of education of the city was also authorized, upon the application of said board of directors, to assess and levy a tax on the taxable property of the city, not exceeding one-tenth of one mill on the dollar valuation thereof, to be applied by the board of directors to the support of such university, college or institution, and also to levy a tax for the establishment and maintenance of an astronomical observatory in connection with such university, etc.

In accordance with this law, the directors were appointed by the city more than twenty years ago, and proceeded to execute the trust, and have ever since so acted. Twenty years ago, by the proceeds of taxation on the property of the city, they erected a college on the homestead property of Mr. McMicken, at a cost of $76,000, and have kept a full corps of professors and employes carrying on said college. They have also maintained an astronomical observatory of high renown in connection with the university.

These provisions of the act of 1870 were further endorsed by the legislature of the state, by incorporating and making them part of the Rev. Stat. of 1880, and by further amendments of 1885 and 1886, and by publishing them by its authority in the edition of 1890, as sec. 4095, to, and including sec. 4105.

This act, we think, fully settles the question in favor of the authority of the city to appropriate such of the property in Burnet Woods, as is proposed, for the uses of such buildings as the directors may determine to erect there for the uses of the university.

In answer to the specific interrogations asked by the university trustees, it is our judgment:

*First*—That if the trustees can make suitable arrangement with the city of Cincinnati to occupy said grounds in Burnet Woods with buildings for said college, they are permitted by the terms of the will to expend such funds arising from the estate thereby devised to the city in trust, as may be necessary to erect them.

*Second* and *Third*—If such buildings be erected, the trustees would be permitted to maintain the colleges provided for by said will with the funds derived from the estate wholly in buildings erected in said Burnet Woods, and they may maintain with said funds, any parts or departments of said colleges or either of them, in said buildings.

*Fourth*—If the college, or any department thereof, be moved in accordance with the above directions, the trustees would be authorized by the will to lease any portion of the property obtained from Luman Watson, and not so used for university site, to a tenant or tenants in the manner provided in the will for leasing other property of the estate, and they may erect on said lots, buildings for other than educational purposes, the rent to be applied to the educational uses provided in said will.

H. D. Peck, Max B. May, W. M. Ramsey, William Strunk, M. F. Wilson, and Theodore Horstman, corporation counsel, for plaintiffs.

Alfred Yaple and H. P. Lloyd, for defendants.